**VOLUNTEER ELECTRIC CO-OPERATIVE**

**v.**

**TENNESSEE VALLEY AUTHORITY.**

Civ. No. 2161.

United States District Court
E. D. Tennessee, S. D.

Dec. 29, 1954.

plaintiff and defendant agreed to increases in the wholesale and retail prices of power resold for industrial purposes. The 1952 amendment contains the following recital: "Whereas, it is the desire of TVA and Distributor that they consult one another as early as feasible in the consideration of service to large new industrial loads in the area served by Distributor, and that standard arrangements be available for normal application, so that only in unusual cases, where the loads are of disproportionate size, or involve unusual service conditions, or where direct service by TVA would make possible substantial economies through coordination of the TVA system with the customer's facilities, would service by TVA, or by Distributor under special arrangements with TVA, be called for * * *" There have been other amendments, but they have no bearing upon the present dispute between the parties.

Harold M. Humphreys, Chambliss, Chambliss & Brown, Chattanooga, Tenn., for plaintiff.

Joseph C. Swidler, Chas. J. McCarthy, Thos. A. Pederson, C. A. Reidinger, Knoxville, Tenn., for defendant.

DARR, Chief Judge.

On June 10, 1939 plaintiff and defendant entered into a contract which provides that plaintiff has participated in the acquisition of certain facilities of the Tennessee Power Company and that the purpose of the contract is to state the terms and conditions under which defendant shall sell electricity to the plaintiff. On March 29, 1949 sections two and three of the contract were amended to state in substance that defendant would supply plaintiff with all of its power requirements within certain limits. Section three as amended sets up the delivery points for power and the demand at each delivery point. Section two provides for the furnishing of additional power when applied for by plaintiff in writing, under certain conditions and restrictions. On April 15, 1952 the contract was further amended whereby

In 1944 certain tentative negotiations were held between representatives of defendant and Bowaters Southern Paper Corporation. Bowaters was interested in erecting a large plant somewhere in the Tennessee valley. Meetings on this question were resumed in January 1951. Defendant assisted Bowaters by furnishing it with information concerning the desirability of certain sites and also gave Bowaters preliminary assurances as to rates for power to be used by their plant if erected. In reliance upon defendant's assurances that it would furnish power at certain rates together with other favorable conditions in the area, Bowaters decided to construct a plant in McMinn County, Tennessee. The plant site was located within the area in which plaintiff has power lines and sells power.

It seems that on March 27, 1952 a meeting was held between representatives of plaintiff and defendant concerning service problems within plaintiff's area and that defendant brought up the Bowaters account suggesting that plaintiff supply the power needed by Bowaters during the construction of its plant. This

was agreed upon. The amount of power to be required by Bowaters during construction was not to exceed 1,000 kw and it appears that defendant suggested plaintiff supply this power since plaintiff's system was adequate for the job. Such service was begun by plaintiff in 1952 and plaintiff was to continue to serve such construction power until Bowaters' plant was completed.

On July 16, 1952 plaintiff wrote defendant requesting the establishment of a substation at the site of the Bowaters plant to supply a minimum of 17,000 kw of power (the firm power required by Bowaters) which plaintiff intended to distribute to Bowaters. Plaintiff also asked defendant to suspend further negotiations with Bowaters until plaintiff and defendant could agree concerning the service to Bowaters. On January 27, 1953 defendant answered plaintiff indicating defendant was studying the problem and would discuss their findings when they were completed. On April 1, 1953 defendant contracted with Bowaters to supply all of its power needs excluding the construction power being furnished by plaintiff. By letter dated April 20, 1953 defendant advised plaintiff that this contract had been negotiated. However, it appears from defendant's affidavits that plaintiff had been advised as early as July 1952 that such a contract was to be negotiated and that on July 29, 1952 defendant wrote plaintiff advising that a proposed draft of such contract had been made.

Plaintiff alleges that it is prepared to furnish the facilities necessary to supply Bowaters with its power requirements, the plant being located within its service area, and that the action of defendant in contracting to furnish such power violates the contract existing between plaintiff and defendant, especially as interpreted by the conduct of the parties throughout the years.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A., defendant has filed an amended motion for summary judgment alleging there is no genuine issue as to any material fact

and therefore defendant is entitled to judgment. Numerous detailed affidavits have been filed by defendant in support of its motion, together with written briefs. Plaintiff has also filed affidavits and brief in support of its position.

The first question which must be disposed of is whether this is a case which may properly be decided on motion for summary judgment. Rule 56(c) of the Federal Rules of Civil Procedure provides in part that summary judgment "shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is *no genuine issue as to any material fact* and that the moving party is entitled to a judgment as a matter of law." (Emphasis supplied.) The determination of the existence of a genuine issue of fact depends upon the entire record of the case being considered.

The Court is aware of the care which must be exercised in making such a determination. In such a case the Court is not authorized to try the issue of fact but rather must determine whether there is an issue to be tried. Toebelman v. Missouri-Kansas Pipe Line Co., 3 Cir., 130 F.2d 1016. The summary judgment procedure is not intended to be used as a substitute for trial of disputed questions of fact. It must be temperately and cautiously used lest abuse reap nullification. Avrick v. Rockmont Envelope Co., 10 Cir., 155 F.2d 568. The true intention of the summary judgment rule is to put an end to useless and expensive litigation if there is no genuine issue as to any material fact, even though an issue may be raised formally by the pleading. Battista v. Horton, Myers & Raymond, 76 U.S.App.D.C. 1, 128 F.2d 29. All of these considerations must be kept in mind in deciding the particular case lest the rights of either party be impinged.

In the present case the basic question is simply what the contract between the plaintiff and defendant means. The contract with pertinent amendments is before the Court having been filed by de-

fendant in response to certain interrogatories put to it by the plaintiff. The plaintiff does not claim that there is any other amendment which affects the rights of the parties. Therefore, the Court must assume that the contract and amendments, as filed by the defendant, constitutes the entire written agreement insofar as it bears on the questions in issue. Plaintiff nowhere disputes the accuracy of the contract as filed by defendant, but rather asserts that a certain interpretation thereof be effected.

What plaintiff claims is that defendant's contract with Bowaters violates the express provisions of plaintiff's contract with defendant and that it also constitutes a violation of certain implied provisions thereof, the implied provisions having arisen by virtue of the conduct of the parties throughout the years. In support of its contention plaintiff asserts the contract requires defendant furnish plaintiff with its entire power requirements, that it gave the required notice for a contemplated increase in power and defendant breached the contract by supplying that power to plaintiff's contemplated customer. Plaintiff also relies upon certain provisions of the TVA Act itself, 16 U.S.C.A. § 831 et seq., which it claims entitles it to preference over industrial consumers. Although plaintiff asserts the course of conduct of the parties was such that certain rights arose by implication under the contract, nowhere in plaintiff's complaint, brief, or affidavits is the specific conduct relied upon set out except by an assertion that defendant never before competed with plaintiff. Though not disputing this, the plaintiff points to other facts which it contends show that its right to supply large industries direct has always been recognized.

■ The purpose of a motion for summary judgment is to separate the formal from the substantial issues raised by the pleadings. Walling v. Fairmont Creamery Co., 8 Cir., 139 F.2d 318. It is intended to permit a party to pierce the allegations of fact in the pleadings and obtain relief where facts set forth in detail in affidavits, depositions, and admissions on file show there is no genuine issue of fact to be tried. Engl v. Aetna Life Ins. Co., 2 Cir., 139 F.2d 469. To hold plaintiff's bare assertions in its pleadings sufficient to bar defendant's right to summary judgment would be contrary to the law. What then is presented in this case? First, a contract relied upon by plaintiff as forming the basis for its complaint. The contents thereof are before the Court and are undisputed by either party. Second, a particular interpretation of the contract asked for by plaintiff because of past conduct of the parties. The one fact asserted by plaintiff in support of the interpretation sought is not denied, namely that defendant never before competed with plaintiff since the date of the contract between the parties. And last a claim for preference by plaintiff under certain provisions of the TVA Act. Again the provisions cited by the plaintiff are undisputed by the defendant who rather contends plaintiff's interpretation thereof is erroneous. The only questions in dispute are of law which, under the express provisions of Rule 56(c), may be decided by the Court. Accordingly the case may properly be disposed of upon defendant's motion for summary judgment.

■ Plaintiff in its amended complaint, brief, and argument relies in part upon the preference which it asserts defendant must afford cooperatives of its type under the Tennessee Valley Authority Act of 1933. The section relied upon reads as follows: "The Board is hereby empowered and authorized to sell the surplus power not used in its operations, and for operation of locks and other works generated by it, to States, counties, municipalities, corporations, partnerships, or individuals, according to the policies hereinafter set forth; and to carry out said authority, the Board is authorized to enter into contracts for such sale for a term not exceeding twenty years, and in the sale of such current by the Board *it shall* give preference to States, counties, municipalities, and *co-*

*operative organizations of citizens or farmers, not organized or doing business for profit, but primarily for the purpose of supplying electricity* to its own citizens or members: *Provided,* That all contracts made with private companies or individuals for the sale of power, which power is to be resold for a profit, shall contain a provision authorizing the Board to cancel said contract upon five years' notice in writing, if the Board needs said power to supply the demands of States, counties, or municipalities." 16 U.S.C.A. § 831i. (Emphasis supplied.) Granted the Act states preference shall be given to states, counties, municipalities, and cooperatives not organized for profit. However the Act does not end there. In a subsequent section it expressly states that sales to industries shall be a secondary purpose "to be utilized principally to secure a sufficiently high load factor and revenue returns which will permit domestic and rural use at the lowest possible rates and in such manner as to encourage increased domestic and rural use of electricity." 16 U.S.C.A. § 831j. The provisions cited are not conflicting so as to vitiate the effectiveness of one as opposed to the other. In fact they are in complete harmony. The policy voiced by the statute empowering defendant to sell direct to industry and pass on to members of the preferred classes the benefits derived thereby are salutary and in furtherance of the avowed intent of the preceding section. Defendant has, from its inception, sold a portion of its power direct to large industries in conformity with that policy. Express approval of defendant's programs in this respect has been voiced by Congress through a joint committee which investigated defendant's practices of direct sales to industry. (S.Doc. 56, 76th Congress, 1st Session 1939). As defendant points out, through the years the earnings realized from such direct sales have been reflected in lower wholesale rates to distributors such as plaintiff with a resulting saving to the ultimate consumer. Plaintiff does not deny this. Neither does plaintiff refute the argument of defendant that service by defendant to all large industrial consumers with the profit going to the particular distributors within whose area such industries are located would in fact operate to increase the over-all cost of power sold by defendant with particular hardship upon the small consumers, who the Act intended to primarily benefit. The position sought by plaintiff would actually circumvent the true intent of Congress that the cost of power to domestic and rural users be kept at the lowest possible rates. Instead, the result would be the enrichment of a small class of distributors such as plaintiff. No wording in the Act directs the courts to subrogate the interests of the classes intended to be protected to those of a small class of distributors in clear violation of the true meaning of the Act just because some distributors are fortunate enough to have large industrial loads located within their service areas and others do not. In the service of large industrial loads with peculiar service problems, particularly as is the case here where additional problems of supplying stand-by-power and purchasing surplus power are involved, it cannot be seen how any question of preference to plaintiff arises. Rather defendant is acting within its authority to sell to industry for the benefit of all members of the preferred classes enumerated in the statute. Plaintiff has failed to show any facts upon which the Court could conclude this policy is being violated.

Plaintiff also claims defendant's action in contracting with Bowaters violates the contract between itself and defendant although it fails to point out the specific provision allegedly breached. Therefore, the Court has carefully considered the entire contract including the pertinent amendments of 1949 and 1952, all of which were executed prior to defendant's contract with Bowaters. Clearly the contract sets up the conditions under which plaintiff will sell and defendant will buy power. But it is equally clear from reading the contract

that nowhere does it purport to define a specific area in which plaintiff is to do business or prohibit the defendant from selling power to other distributors.' Neither does it contain any provision prohibiting defendant from selling power direct to large industrial consumers located within the area served by plaintiff. Regardless of what is sought to be read into this document, by its own terms it is simply a contract whereby defendant agrees to sell power to plaintiff wholesale for resale at certain specified prices with the provision that defendant will provide plaintiff with all its power needs "to the extent that Authority, in its judgment, has power available after all requirements of Authority, the United States of America, and prior contractual commitments have been met * * *" The 1949 and 1952 amendments were duly executed, are not objected to, and therefore became an integral part of the original contract.

■ The contract is not ambiguous in its terms. It is not for the Court to speculate why the parties failed to include more in it than they did so long as the contract as it exists is clear and unambiguous. New York Life Ins. Co. v. Jackson, 7 Cir., 98 F.2d 950.

Although recitals in a contract are not necessarily controlling it is worthy of note that the unambiguous nature of this contract is supported by the recital in the 1952 amendment which states that "in unusual cases, where the loads are of disproportionate size" service may be by defendant direct. As noted in plaintiff's brief, reasoning by analogy to the field of agency, an intention to create an exclusive agency must be spelled out and unless the contract is ambiguous such an intention will not be created by inference.

■ However, controlling on the point is the long established rule that public contracts are to be strictly construed and that nothing passes by implication. One of the best statements of the principle appears in Knoxville Water Company v. City of Knoxville, 200 U.S.

22, 26 S.Ct. 224, 228, 50 L.Ed. 353. There the city had begun construction of its own waterworks system. It abandoned the project and contracted with the Water Company, who bought the property held by the city, to construct and operate a waterworks system. The city agreed that it would not grant any other person or corporation the right to furnish water to the city for a specified period. When the city then decided to construct a competing system the Water Company sought to restrain the city, claiming its contract gave it exclusive rights. After a thorough discussion of the cases the Court used the following language in deciding in favor of the city: "It is true that the cases to which we have referred involved in the main the construction of legislative enactments. But the principles they announce apply with full force to ordinances and contracts by municipal corporations in respect of matters that concern the public. The authorities are all agreed that a municipal corporation, when exerting its functions for the general good, is not to be shorn of its powers by mere implication. If, by contract or otherwise, it may, in particular circumstances, restrict the exercise of its public powers, the intention to do so must be manifested by words so clear as not to admit of two different or inconsistent meanings." In conclusion, the Court used language which leaves no room for doubt as to the degree of protection to be afforded public rights by the courts when called upon to construe contracts which deal with them: "It is, we think, important that the courts should adhere firmly to the salutary doctrine underlying the whole law of municipal corporations and the doctrines of the adjudged cases, that grants of special privileges affecting the general interests are to be liberally construed in favor of the public, and that no public body, charged with public duties, be held upon mere implication or presumption, to have divested itself of its powers." In accord on the principle involved: Skaneateles Water Co. v. Skaneateles, 184 U.S. 354, 22 S.Ct. 400, 46 L.Ed. 585; City of Joplin

v. Southwest Missouri Light Company, 191 U.S. 150, 24 S.Ct. 43, 48 L.Ed. 127.

Plaintiff's contract with defendant does not prohibit defendant from selling direct to large industrial consumers within plaintiff's area.

The case could be disposed of without further comment on this point. However, because of the importance attached to the particular theory of the case, the Court wishes to comment briefly upon plaintiff's assertion that the course of conduct of the parties gave rise to an implied provision that defendant would not do business direct within plaintiff's service area. In support of their position plaintiff states defendant never competed with plaintiff before and that defendant also states in one of its publications "what the dividing line should be between industrial loads served by distributors of TVA power and those served by TVA" is unsettled. Neither of these facts were denied by defendant but numerous and detailed facts relating to its direct sales were pointed out in an attempt to show what the "course of dealing" over the years has been.

Assuming arguendo that the conduct of the parties controlled, the Court can only say that plaintiff would still be denied recovery. The following facts are undisputed and are sufficient to show plaintiff's position untenable although numerous other facts bearing on this issue were brought out by the defendant. At the time plaintiff and defendant executed their contract in 1939 defendant was already serving direct numerous large industries, including the Aluminum Company of America. Over half of its annual production of power was going directly to these large industries. Defendant's annual report to Congress for the fiscal year ending June 1938 pointed to this service explaining that it was enabling defendant to carry out the announced policy of the TVA Act to secure a sufficiently high load factor to permit domestic and rural use at lower prices. In 1938 Congress appointed a special joint committee to investigate certain phases of defendant's operations, one of which was whether defendant had exhibited partiality in its contracts with industry. Lengthy hearings were held by the committee and naturally these hearings received wide notoriety. The committee's report discussed various contracts defendant made with large industries and approved the policy of direct sales thereto. As noted previously, in May 1939 plaintiff and defendant both were parties to a contract whereby the properties of the Tennessee Electric Power Company were bought. In fact it appears that the property thereby acquired by plaintiff was in part responsible for the present contract with defendant in that plaintiff thereafter enlarged its power operations. One of the exhibits to the contract disposing of the Tennessee Electric Power Company property has been filed in this suit by defendant. It provided that all plants, property, facilities, etc., serving certain industrial consumers were to go to defendant. Some of these large industries serving direct were in the area, or proposed area, to be served by the plaintiff—plaintiff must surely have been thereby acquainted with defendant's practice of serving some industries direct. Through the years other industries have been added to those served by defendant until at present defendant serves directly twenty-eight large industrial loads, of which seven are operated by federal agencies and twenty-one by private industry. These facts were not hidden or concealed from plaintiff. In fact they are matters of public record with which plaintiff, itself a distributor of electric power keenly interested in policies affecting its operations, could not but help to be acquainted.

In passing it is noted that most of the industries served direct by defendant have certain common characteristics in that they are all unusually large consumers of power and in most instances have certain service problems created by the size and type load required. The Bowaters plant presents just such problems. Its power requirement is some 27,000 kw, which includes substantial amounts of stand-by-power which a distributor such

as plaintiff is unequipped to satisfy. It will also have occasional excess power produced by its own generators which defendant can use but which, due to its irregularity in availability and amount, plaintiff would have no use. The 27,000 kw load of Bowaters is a large industrial load similar to that of the other large businesses presently being served by defendant. It is clearly not the type load being served by plaintiff—plaintiff's largest customer being one requiring 696 kw. These facts are mentioned merely to demonstrate that the Bowaters account is clearly of the type best able to be served by defendant direct if you use a comparison of the type industries now being so served as the test.

During the proceedings plaintiff submitted thirty-two written interrogatories to defendant. Defendant answered fully to all except the twenty-fifth to which it filed formal objections. The mentioned interrogatory asks defendant to file copies of all studies or memoranda concerning arrangements for providing service for large consumers in the TVA area. Defendant claims, among other things, that to require an answer would be oppressive and unreasonably expensive. Disposition of this question was deferred to the end of this opinion in the belief that the foregoing development and discussion of the facts of the case would tend to clarify the Court's ruling hereon. Defendant's affidavit in support of its objection discloses that studies and memoranda coming within the category called for would amount to some 300,000 sheets and that the time spent in ferreting them out would take weeks, let alone the time and cost involved in reproducing pertinent material. Certain portions of this material is alleged to be confidential since it concerns business practices, rates, etc., of electrical distributors. Still other portions are alleged to be classified, being vital to our national security.

The remaining interrogatories call for much of the specific information evidently sought by the plaintiff. To all of these defendant has answered willingly and in the greatest detail. It is felt the information supplied by defendant discloses with reasonable accuracy the practices followed in providing service for large consumers. The rule authorizing interrogatories should be given a liberal interpretation, but the Court is vested with reasonable discretion in determining whether a party is entitled to have interrogatories answered. Considering the whole record, the information furnished by defendant, and after carefully considering the value of the information sought as against the burden which would be placed upon defendant, the Court's opinion was and is that defendant should not be required to answer the twenty-fifth interrogatory and its objection thereto is sustained.

Now in summation of the reasons for the decision reached, the Court is of the opinion:

(1) That the contract between the parties, including the amendments, construed according to its terms and in connection with the intentions of the Tennessee Valley Authority Act and the conduct of the parties over the years, recognizes the authenticity of the contract between the defendant and Bowaters Southern Paper Corporation, whereby the ultimate result will be beneficial to the non-profit organization distributing electricity resulting in lower rates to individual and small consumers; and

(2) a fair construction of the contract between the parties, without regard to consideration of the broad situation announced, is not breached by the contract made by the defendant and Bowaters.

Judgment is awarded the defendant.

This opinion will serve as the findings of fact and conclusions of law.