[No. 23543. *En Banc.* June 16, 1932.]

WILLAPA ELECTRIC COMPANY, *Appellant,* v. S. L. DENNIS
CONSTRUCTION COMPANY *et al., Respondents
and Cross-appellants.*[1]

*Thomas S. Grant,* for appellant.

*Fred M. Bond* and *Meier & Meagher,* for respondent
and cross-appellant S. L. Dennis Construction Com-
pany.

*Welsh & Welsh,* for respondent and cross-appellant
Osborn.

[1]Reported in 12 P. (2d) 609.

PARKER, J.—The plaintiff electric company commenced this action in the superior court for Pacific county, seeking recovery for electric energy furnished and offered to be furnished by it to the defendants, construction company and Osborn, in pursuance of a contract entered into between it and the construction company, which contract was thereafter assigned by the construction company to Osborn. Trial in that court, sitting without a jury, resulted in findings and judgment awarding to the electric company recovery partially as prayed for against the construction company and Osborn. The construction company has appealed, contending that no recovery should be awarded against it. Osborn has appealed, contending that the award against him is excessive in amount. The electric company has appealed, contending that the award to it is deficient in amount.

The facts are not seriously in dispute, and, we think, may be fairly summarized as follows: The electric company is a public service corporation, engaged in manufacturing and distributing electric power in the city of Raymond and neighboring territory. The construction company, while the owner and operator of a rock crusher plant situated near Raymond, entered into a contract with the electric company, reading, in so far as need be here noticed, as follows:

"POWER CONTRACT.

"This agreement made at Raymond, Washington, this 13th day of March, 1928, by and between S. L. Dennis Construction Company, a corporation organized and existing under the laws of the state of Washington, hereinafter called Consumer, and Willapa Electric Company, a corporation organized and existing under the laws of the state of Washington, hereinafter called Company, Witnesseth:

"In consideration of mutual promises and subject to terms and conditions herein contained, the Company

agrees to connect its 3 phase 220 volt service with premises of Consumer at site of rock crusher, and to furnish electric energy for 105 H. P. motor, and Company will install necessary meters to record the service and energy consumed and will base its charges therefor upon the reading of said meters; and Company agrees to furnish to Consumer and Consumer agrees to purchase from Company all electric service and energy for power to be required or used by Consumer on said premises during the period of three (3) years, beginning on the date when service is commenced hereunder, and to pay therefor at the rate herein specified, viz:

"For the first 3,000 k. w. h. used monthly 2.7c per k. w. h.

"All over 3,000 k. w. h. used monthly 2.75c per k. w. h.

"Minimum monthly charge under each meter whether energy is used or not, $1.00 for each horsepower, or fraction thereof, of connected load, . . .

"The Consumer agrees to notify the Company before making any changes in the connected load at its premises hereinabove described. . . .

"If the Consumer violates this contract there shall immediately become due and payable as damages, not as a penalty, the minimum payment named herein for the unexpired term of the contract, or extension thereof; provided, however, that if the Consumer discontinues the service temporarily without intending to violate this contract, then the monthly minimum charge shall be paid monthly as herein provided. . . ."

The electric company commenced to furnish electric energy as agreed, about June 1, 1928. For the making of the connection, the electric company constructed approximately two miles of new pole and wire line at an expense of some four thousand dollars. It did not have such prospective use for that new line to warrant its construction, apart from the prospective service under its contract with the construction company;

though it had prospect for, and did serve over that line, some other consumers.

The construction company operated its plant during June, 1928, and paid the electric company for all power furnished under the contract during that month. On June 27, 1928, the construction company sold its plant and business to Osborn; and also assigned to him "all of its right, title and interest in and to said power contract." He agreed "to be bound by the terms and conditions thereof." The electric company was duly notified of this sale and the assignment of the contract to Osborn.

During July and August, 1928, the plant had a connected electric load with the electric company's power line of 145 h. p., but no use was made thereof by Osborn during those two months, the plant not being operated by him during any portion of that period. This, it is conceded by Osborn, rendered him indebted to the electric company in the sum of $145 for each of those months, that being the minimum contract charge for that connected load. This indebtedness has not been paid.

On August 22, 1928, Osborn, by letter to the electric company, stated to it in part: "We do not know whether or not the plant will ever again be operated." On August 27, 1928, Osborn notified the electric company in writing that the motors at the plant had been disconnected. Osborn has not at any time since then connected the motors of the plant with the electric company's power line; neither has he nor the construction company paid the electric company for any power since then. The plant has not been in operation since June, 1928, so neither the construction company nor Osborn has had, since then, any required use of electric energy at the premises of the plant. The electric

company has been able and willing to furnish energy, as it agreed by the contract, at all times since then.

On January 31, 1930, this action was commenced; the electric company seeking recovery from the construction company and Osborn of the minimum charge of $290, for the 145 h. p. connected load during July and August, 1928; and also seeking recovery from the construction company and Osborn of the $105 minimum load charge for each of the months thereafter during the whole of the remainder of the term of the contract.

The trial court awarded judgment in favor of the electric company and against the construction company for $290 for the connected load during the months of July and August, 1928, and $105 for each of the months thereafter up until the date of the commencement of the action; and awarded the electric company judgment against Osborn for one-half of the total thereof; and directed that, upon payment of that judgment by Osborn, such payment shall be credited upon the judgment against the construction company. This adjudged, limited liability of Osborn was manifestly rested by the trial court upon certain provisions in the assignment of the contract from the construction company to Osborn, which is of no moment in our present inquiry.

It is contended in behalf of the construction company and Osborn that the power contract does not require either of them to take or pay for any service or energy in excess of the requirement of either of them in the operation of the plant. The limit of the obligation of the electric company is "to furnish electric energy for 105 h. p. motor." The limit of the obligation of the consumer is "to purchase from company all electric service and energy for power to be required or used by consumer on said premises."

We do not see in this contract any prescribed minimum quantity of service or energy which the consumer is under any obligation to take or pay for, other than the amount thereof "required or used" at the plant. The evidence plainly shows that neither of these consumers has had any need or requirement for any service or energy between August 27, 1928, when the electric company was notified that the motors of the plant had been disconnected from the electric company's power line, up to the time of the commencement of this action.

We do not overlook the words of the contract "minimum monthly charge under each meter whether energy is used or not, $1.00 for each horsepower, or fraction thereof, of connected load." This, we think, means only that, when the consumer maintains a connected load, or wholly disconnects the connected load and fails to notify the electric company of such disconnection, the consumer must pay for the load up to the time of notice of disconnection thereof, whether "used or not."

Neither do we overlook the further provisions of the contract relating to the rights of the electric company which might accrue to it, "if consumer violates this contract;" but we are quite unable to see that the consumer can be held to have violated the contract by disconnecting the load, and notifying the electric company thereof, when the consumer has no requirement or use for the service or energy in the operation of the plant.

There have been brought to our attention but few decisions relating to the obligation of the purchaser of a commodity, measured solely by the extent of his requirements in a particular business, to be furnished or delivered continuously or periodically over a specified period of time. The law seems to be that the obli-

gation of such a purchaser to take the commodity is measurable by his requirement or necessity in his business, with reference to which the contract for so furnishing the commodity is made, when there is no agreed, fixed minimum of the amount of the commodity to be so furnished.

In *Drake v. Vorse,* 52 Iowa 417, 3 N. W. 465, decided in 1879, there was drawn in question the obligation of the purchaser under a contract which read:

"I hereby agree to make all the school-seat castings that A. S. Vorse may want during the year 1873. [Here follows the agreed price and the name of the place for delivery.]" Signed by Drake, the vendor, and accepted by Vorse, the vendee.

Drake furnished the castings until sometime in May of that year, when Vorse, the vendee, declined to take any more of the castings, having changed his business and gone into partnership with another for the manufacturing of school furniture. It was squarely held that he did not violate the contract, because he did not want any more of the castings; the court observing:

"It was certainly the defendant's [Vorse's] privilege to discontinue business at any time when it should appear to him that his interest demanded it, and that, too, without becoming liable to the plaintiff [Drake] in damages. He did discontinue business upon his individual account. After that he did not individually want or need any castings. . . ."

The court seems to have treated the word "want" in the sense of "need," seemingly having in mind that, if Vorse had continued in business individually, and in that capacity had needed more castings and had bought them of another, he might be held to have violated his contract.

In *McKeever, Cook & Co. v. Canonsburg Iron Co.,*

138 Pa. St. 184, 16 Atl. 97, 20 Atl. 938, there was drawn in question a somewhat similar claim of liability of a vendee under a contract reading:

"We will agree to supply you with what coal you will require for your mill, for three years time from November first, 1882, at the following prices delivered at your works: [Here follow specified prices and kinds of coal.]"

This proposal became the contract by its due acceptance. Within the specified period of the contract, natural gas, sufficient for fuel purposes, was discovered in the vicinity of the vendee's works, resulting in the vendee no longer having any need or requirement for coal in the operation of its works. Holding that the vendee did not violate its contract by refusal to take any more coal, Justice Gordon, speaking for the court, said:

". . . it is obvious, that no limit was, by the contract, put upon the discretion of the defendants as to the amount of coal they were to use in the mill. It might be much, little, or none at all. What *coal* was necessary for consumption in their works they must take from the plaintiffs. This was all they were bound to do, and all the plaintiffs were bound to furnish them; and it was of no consequence whether the falling off in that consumption was occasioned by the contraction of their business, or by the introduction of gas. In either case, less coal was necessary for the defendants' manufactory, and they were not obliged to pay for what they did not require."

In *Helena Light & Ry. Co. v. N. P. Ry. Co.*, 57 Mont. 93, 186 Pac. 702, there was drawn in question the rights of the vendee railway company under a contract by the terms of which it was to be furnished "all electric current the railway company may require for lighting and power purposes at its pumping station," and at several other specified places. The abandonment of the

railway company's pumping station, and it thereby no longer having any requirement for electric current for light or power purposes there, and its manifested purpose of not using any more light or power there, was held not to be a violation of its contract or a forfeiture of its rights under the other provisions of the contract.

No authority to the contrary of these decisions touching the problem here presented has come to our notice. In 7 A. L. R., commencing at page 498, may be found a somewhat exhaustive note covering various phases of this and kindred problems. The portion particularly applicable to our present inquiry may be found at page 507.

Some contention is made, rested upon the fact that the electric company incurred an expense of some four thousand dollars in extending its line some two miles to render its electric energy available to the construction company at its rock crushing plant. There is no language in the power contract pointing to that expenditure on the part of the electric company as furnishing any consideration for the obligation assumed by the construction company of taking or paying for "power to be required or used by consumer on said premises."

The power contract, being plain and unambiguous in its terms, as we view it, is not subject to variation in its meaning by this expenditure of the electric company, though it was known at the time of the making of the contract that such expenditure would be necessary on the part of the electric company in order to fulfill its obligations under the contract. There was ample, legal consideration on the part of the construction company to support the contract, in its promise to purchase from the electric company "all electric

service and energy for power to be required or used by consumer on said premises."

Observations made in *Drake v. Vorse,* 52 Iowa 417, 3 N. W. 465, and *Helena Light & Ry. Co. v. N. P. Ry. Co.,* 57 Mont. 93, 186 Pac. 702, clearly support this conclusion. Our own decision in *Kanasket Lumber & Shingle Co. v. Cascade Timber Co.,* 80 Wash. 561, 142 Pac. 15, also lends support to this conclusion, though that case may not be exactly in point.

Some contention is made separately in behalf of the construction company that it in no event is liable even for the unpaid balance owing to the electric company for the 145 h. p. load electric energy furnished by it to Osborn, though not used by him, during the months of July and August, 1928; this upon the theory that the construction company had disposed of the plant to Osborn on June 27, 1928, and that thereupon its requirement for service and energy had ceased.

Under ordinary circumstances, it would seem that the decisions above noticed would support this contention; but by the terms of the contract "the consumer agrees to notify the company before making any change in the connected load." The construction company did not notify the electric company of any change being made in the connected load except as Osborn, its assignee, so notified the electric company of the disconnection on August 27, 1928. This, we think, renders the construction company as well as Osborn liable for the indebtedness owing to the electric company as for service and energy, in legal effect, supplied during those two months, because of the maintenance of the "connected load" during that period.

We conclude that the electric company is entitled to recover against the construction company, as well as against Osborn, in the sum of $290 for the 145 h. p. load connected during the months of July and August,

1928, and that the electric company is not entitled to any other award in this case. Having arrived at this conclusion, it results that the respective appeals do not call for further discussion.

The judgment is reversed, and the cause remanded to the superior court with directions to enter a judgment in favor of the electric company, and against both the construction company and Osborn, for the sum of $290. The construction company and Osborn shall be jointly awarded their costs against the electric company in prosecuting their appeals to this court.

MAIN, MITCHELL, HOLCOMB, HERMAN, and MILLARD, JJ., concur.

BEALS, J. (dissenting)—Careful study of the contract between the parties, quoted in the majority opinion, convinces me that one of the basic elements thereof is the minimum monthly charge which, in my opinion, respondent construction company agreed to pay for the term of the contract ''whether energy is used or not.'' It seems to me that the intent of the contracting parties is clearly expressed in the contract, particularly in view of the situation of the parties and the large expenditure made by appellant to carry current to respondent's plant, and that respondent company should be held liable to appellant for the minimum charge specified in the contract over the term referred to therein.

During the month of June, 1928, respondent construction company assigned to respondent Osborn all its rights under the contract with appellant, the agreement between them reading in part as follows:

''It is further agreed between the parties hereto that if during the existence of said power contract the second party (Osborn) should desire to discontinue said services and disconnect the load, that he shall have the right so to do by making settlement with the Willapa

Electric Company, in which event he shall notify the first party (Dennis Construction Company), and if the first party so desires, it may negotiate with the Willapa Electric Company for the cancellation of said agreement, and if said agreement should be cancelled or the load disconnected, then each of the parties hereto shall bear and pay one-half of the amount which the Willapa Electric Company receives in consideration of the cancellation of said contract or the disconnecting of the load. And if either party hereto should pay the whole of said sum, it shall be entitled to recover from the other one-half of the amount so paid.''

The following appears on the contract following the signatures:

''It is understood and agreed that in case of cancellation that the second party (Osborn) shall not be required to pay more than $1,500.00.''

Under date September 6, 1928, Mr. Osborn wrote the construction company the following letter:

''Mr. S. L. Dennis,          September 6, 1928.
''Raymond, Washington.
''Dear Sir:
''Confirming our verbal statement to you, we have decided to cancel the contract with the Willapa Electric Company of Raymond, assigned to us in the agreement between S. L. Dennis Construction Company and the writer, dated June 27, 1928.

''We are notifying you to immediately arrange the cancellation of this agreement if you now desire to handle the matter, which right you reserved under the above mentioned contract. Kindly advise us immediately if you prefer that we, ourselves, negotiate this cancellation.

''Inasmuch as Mr. Snider is very anxious to have the matter settled, we would ask that you use due diligence in an effort to arrange settlement without delay.          Yours truly,
                    ''W. R. Osborn.''

The contract between respondents, in the light of Mr. Osborn's letter, indicates that, as between them-

selves, respondents understood that a liability existed to pay appellant for the remainder of the three year period, the minimum called for in the contract between appellant and the construction company.

In my opinion, respondent construction company is liable to appellant upon the basis herein indicated, respondent Osborn being liable for his proportion of that amount.

For these reasons, I dissent from the conclusion reached by the majority.

TOLMAN, C. J., concurs with BEALS, J.