OLIVER–MERCER ELECTRIC COOPERA-
TIVE, INC., Plaintiff and Respondent,

v.

Gene FISHER and Bill Faiman, Partners, As-
sociated in Business under the firm name
and style of Missouri River Sand and Grav-
el Company, Defendants and Appellants.

No. 8281.

Supreme Court of North Dakota.

Nov. 10, 1966.

Richardson & Blaisdell, Hazen, for plaintiff and respondent.

Zuger, Zuger & Bucklin, Bismarck, for defendants and appellants.

TEIGEN, Chief Justice (on reassignment).

This is an appeal by the defendants, who hereafter will be referred to as Fisher and Faiman, from a judgment of the district court in favor of the plaintiff, which will be hereafter referred to as the Co-op, in the amount of $7,200, claimed to be the amount due under a contract for seasonal electric service entered into between the parties. The case was tried to the court without a jury, and trial de novo has been demanded on review in this Court.

It is agreed the defendants, Fisher and Faiman, were operating a sand and gravel business as a partnership under the firm name and style of Missouri River Sand & Gravel Company; that the Co-op was a supplier of electric power and a corporation operating under the corporate name of Oliver-Mercer Electric Cooperative, Inc.

In the spring of 1962, the defendants, Fisher and Faiman, opened a new gravel pit at Sanger, North Dakota, and were in need of three-phase electrical service of sufficient quantity to operate a 500 horsepower load. The defendants approached the plaintiff Co-op concerning electrical service to their gravel pit at Sanger, and it was determined that to provide the required service to this location would require construction of a 41,000 volt transmission line from a point approximately five miles distant, and would entail crossing the Missouri River with about an 1800-foot span. It also required setting up a 600 KDA substation at Sanger and a distribution transformer. After several conferences, the contract in issue in this action was entered into on March 21, 1962. Its execution by the respective parties is admitted.

The contract provides:

The Seller shall sell and deliver to the Consumer, and the Consumer shall purchase all of the electric power and energy which the Consumer may need at the location described in Exhibit A, attached hereto and by this reference made part hereof, up to 400 kilowatts, upon the following terms:

1. Service Characteristics.

a. Service hereunder shall be alternating current, 3 phase, 4 wire, sixty cycles, 120/240/440 volts.

b. The Consumer shall not use the electric power and energy furnished hereunder as an auxiliary or supplement to any other source of power and shall not sell electric power and energy purchased hereunder.

c. Service hereunder shall be furnished on a seasonal basis (Less than 12 months per year) and the season (hereafter called "Season") shall be defined in this section. The Season shall begin on April 1 and end on November 15 each year.

2. Payment.

a. The Consumer shall pay the seller for services hereunder at the rates and terms and conditions as set forth in Schedule LP. Should the Consumer desire service during any period other than the Season, the attached Schedule B shall apply during the time such service is used.

b. The initial billing period shall start at the commencement of each Season.

c. Bills for service hereunder shall be paid at the office of the Seller in Hazen, State of North Dakota. Such payment shall be due on the 20th day of each month as provided in the Schedule for service furnished during the preceding billing period. If the Consumer shall fail to make any such payment within fifteen days after such payment is due, the Seller may discontinue service to the Consumer upon giving fifteen (15) days' written notice to the Consumer of its intention so to do, provided, however, that such discontinuance of service shall not relieve the Consumer of any of its obligations under this Agreement.

d. The Consumer agrees that if, at any time, the rate under which the Seller purchases electric service at wholesale is modified, the Seller may make a corresponding modification in the rate for service hereunder. The Consumer may also request an annual review of the rate in effect should the investment/revenue ratio improve.

3. Membership.

The Consumer shall become a member of the Seller, shall pay the membership fee and be bound by such rules and regulations as may from time to time be adopted by the Seller.

4. Continuity of Service.

The Seller shall use reasonable diligence to provide a constant and uninterrupted supply of electric power and energy hereunder. If the supply of electric power and energy shall fail or be interrupted, or become defective through act of God, Governmental authority, action of the elements, public enemy, accident, strikes, labor trouble, required maintenance work, inability to secure right-of-way, or any other cause beyond the reasonable control of Seller, the Seller shall not be liable therefor or for damages caused thereby.

5. Right of Access.

Duly authorized representatives of the Seller shall be permitted to enter the Consumer's premises at all reasonable times in order to carry out the provisions hereof.

6. Term.

This Agreement shall become effective on the date first above written and shall remain in effect until three (3) years following the start of the initial billing period and thereafter unless terminated by either party giving to the other six (6) months' notice in writing.

7. Succession and Approval.

a. This Agreement shall be binding upon and inure to the benefits of the successors, legal representatives and assigns of the respective parties hereto.

b. If the KW demand shall exceed 350· kilowatts, approval of the Adminis-

trator of the Rural Electrification Administration will be required.

Exhibit A, attached to the contract, reads as follows:

Exhibit A

Description and Location of Service

Type of Operation: Sand and Gravel Plant

Service Will Be Made Available On or Before: May 1, 1962

Size of Largest Motor: 150 HP (500 total HP)

Section: 26 Township: 143 Range: 81

Town: Sanger

Owner: Missouri River Sand and Gravel Co.

Address: % William Faiman
238 W Divide
Bismarck, North Dakota

◆

Large Power Service, Schedule LP, reads as follows:

LARGE POWER SERVICE
Schedule LP
Oliver-Mercer Electric Cooperative, Inc.

Rate

Demand Charge
$1.25 per month per KW of billing demand.

Plus Energy Charge
First 200 kwh's per month per kw of billing demand at 1.5¢ per kwh. Balance of kwh's @ 1¢ per kwh per month.

Determination of Billing Demand

The billing demand shall be the maximum kilowatt demand established by the consumer for any period of fifteen consecutive minutes during the month for which the bill is rendered, as indicated or recorded by a demand meter and adjusted for power factor as provided below.

Power Factor Adjustment

The Consumer agrees to maintain unity power factor as nearly as practicable. The measured demand will be adjusted for consumers with 50 kw or more of measured demand to correct for average power factors lower than 90%, and may be so adjusted for other consumers if and when the Seller deems necessary. Such adjustments will be made by increasing the measured demand 1% for each 1% by which the average power factor is less than 90% lagging.

Minimum Annual Charge for Seasonal Service

The minimum annual charge shall be $9.00 per maximum kw demand during any one month of the season or $3600. whichever amount is greater. Should service be required during any period other than the season, the established Schedule B shall apply.

Terms of Payment

The above rates are net, the gross rates being ten percent higher on the first $25.00 and two percent on the remainder of the bill. In the event the current monthly bill is not paid within fifteen days from the date of the bill, the gross rates shall apply. In the event that the $3600. minimum is applicable, the balance due to fully pay the $3600, which is owed, shall be paid within 30 days after the end of the current season.

Schedule B

Oliver-Mercer Electric Cooperative, Inc.

Rate

First 40 kwh per month 12.5¢ per kwh

Next 40 kwh per month 6¢ per kwh

Next 920 kwh per month 3¢ per kwh

Next 2000 kwh per month 2¢ per kwh

Over 3000 kwh per month 1.5¢ per kwh

The minimum monthly charge shall be $10.00

Schedule A is omitted, being unimportant in this action.

The Co-op built the line and furnished electrical power and energy which was used by Fisher and Faiman in the season 1962. Fisher and Faiman paid to the Co-op $11,216.57 for electrical power and energy used during that season. At the close of the 1962 season, on October 2, the defendants, Fisher and Faiman, gave the plaintiff a written notice of termination, which reads as follows:

October 10th will mark the end of our 1962 season of operation at Sanger. We know now that we will not need energy at Sanger next year. The deposit in that area has been exhausted and we will not have a washing plant at Sanger next year. I am therefore giving notice herewith that we will not need service there after October 10th as called for in our contract.

The plaintiff Co-op, after receipt of this notice, asserted the defendants Fisher and Faiman were liable to pay for service, whether needed, required or furnished, for the seasons 1963 and 1964. This the defendants promptly denied. This action was brought for the alleged minimum payments for 1963 of $3,600, and for 1964 of $3,600,

or a total of $7,200. Two issues were raised in defense of this claim: (1) that the contract properly construed requires the defendants to pay for only electrical power and energy they needed or required, and which was actually furnished; and (2) that if the court holds against the defendants on the first issue, the contract be reformed on the ground that it is not in accord with the agreement of the parties or the representations of the plaintiff Co-op, so that provision number 6 of the contract under the heading "Term" will read: "This agreement shall become effective on the date first above written and shall remain in effect until three (3) years following the start of the initial billing period unless terminated by either party giving to the other six (6) months' notice in writing." In other words, it is their contention that there should be eliminated from paragraph number 6 of the contract the words "and thereafter."

The first issue was submitted to the trial court on stipulated facts. The trial court issued its memorandum opinion in which it found against the defendants Fisher and Faiman. Pursuant to the stipulation, the court then tried the second issue, and evidence was introduced by both parties. Much of the evidence introduced is in conflict. After both parties had rested, the trial court found in favor of the plaintiff Co-op, and denied affirmative relief by way of reformation. Judgment was entered in favor of the Co-op and against Fisher and Faiman.

■ It is well recognized that the object in construing a contract is to ascertain and give effect to the intention of the parties, and to accomplish that purpose the contract should be construed as a whole. Section 9–07–06, N.D.C.C.; Delzer Construction Company v. New Marian Homes Corporation, N.D., 117 N.W.2d 851; Larson v. Wood, 75 N.D. 9, 25 N.W.2d 100; Hutchinson v. Bohnsack School Dist., 51 N.D. 165, 199 N.W. 484; Alden v. Central Power Electric Cooperative, D.C., 137 F.Supp. 924.

All of its parts shall be considered together and every clause, sentence, or provision should be given effect consistent with the main purpose of the contract. Conklin v. North American Life & Casualty Company, N.D., 88 N.W.2d 825; Delzer Construction Company v. New Marian Homes Corporation, supra.

The intention of the parties to a written contract must, if possible, be ascertained from the writing alone. Section 9-07-04, N.D.C.C.; Battagler v. Dickson, 76 N.D. 641, 38 N.W.2d 720. The language of the contract is to govern its interpretation, if the language is clear and explicit and does not involve an absurdity. Section 9-07-02, N.D.C.C.

The case in the trial court was tried piecemeal. The question of interpretation of the contract was first submitted to the court on stipulated facts. These facts consisted of the contract, and the notice of termination given by the defendants on October 2, 1962 and received by the Co-op on October 5, 1962. Fisher and Faiman contend that the contract properly construed is a "requirements" contract by which they were liable only for their requirements or needs taken under the contract, whereas it is the contention of the Co-op that the contract is an "availability" contract by which Fisher and Faiman were liable for electric energy made available for the minimum period of time provided by the contract.

In support of Fisher and Faiman's contention that the contract requires them to pay for only electrical power and energy needed or required, and which was actually furnished, they cite Willapa Electric Co. v. S. L. Dennis Const. Co., 168 Wash. 416, 12 P.2d 609. This case involved the construction to be placed upon a contract to furnish electric power. The contract in that case in part provided:

* * * Company agrees to furnish to Consumer and Consumer agrees to purchase from Company all electric service and energy for power to be required or used by Consumer on said premises during the period of three (3) years, beginning on the date when service is commenced hereunder, and to pay therefor at the rate herein specified, viz.:

* * * * * *

Minimum monthly charge under each meter whether energy is used or not, $1.00 for each horsepower, or fraction thereof, of connected load. * * *

The Consumer agrees to notify the Company before making any changes in the connected load at its premises hereinabove described. * * *

This case, however, is not in point because the contract did not contain a provision to pay a minimum charge which the consumer was obligated to pay regardless of whether he used any electrical energy during the term of the contract. The Washington Court held:

The limit of the obligation of the consumer is "to purchase from company all electric service and energy for power to be required or used by consumer on said premises." We do not see in this contract any prescribed minimum quantity of service or energy which the consumer is under any obligation to take or pay for, other than the amount thereof "required or used" at the plant.

The consumers' motors in the plant had been disconnected from the electric company's power line and the company was notified. The court, referring to the words of the contract "minimum monthly charge under each meter whether energy is used or not, $1.00 for each horsepower, or fraction thereof, of connected load," held only that when the consumer maintains a *connected* load, or wholly disconnects the connected load and fails to notify the electric company of such disconnection, the consumer must pay for the load up to the time of notice of disconnection, and that the consumer did not violate the contract by disconnecting the load and notifying the electric company thereof when the consumer had no require-

ment or use for the service or energy in the operation of the plant. The contract in this action, however, does provide for a minimum charge and a minimum period of time. It states:

> The minimum annual charge shall be $9.00 per maximum kw demand during any one month of the season or $3600. whichever amount is greater.

The provision for termination of the contract is provided in Section 6, which states the contract shall "remain in effect until three (3) years following the start of the initial billing period and thereafter unless terminated by either party giving to the other six (6) months' notice in writing." We do not interpret this contract as a "requirements contract" by which the supplier agrees to sell only the amount of energy actually used by the consumer who can cease to use the commodity at any time and be under no obligation to pay anything except for that which it actually used. Rather, it is an "availability" contract for a three-year term under which the consumer is obligated to pay the minimum specified during that period and thereafter unless it is terminated in accordance with the provisions of the contract.

◼ The defendants, Fisher and Faiman, also argue that the contract should be interpreted to express the intent of the parties that the plaintiff Co-op would receive a minimum of at least $3,600 for a three-season period, or a total of $10,800 minimum, and that the defendants, Fisher and Faiman, paid a greater amount than $10,-800 in the first year and for that reason could terminate the contract. We are unable to read this intent into the contract, and find the argument has no merit. Section 6 of the contract provides:

> This agreement shall become effective on the date first above written and shall remain in effect until three (3) years following the start of the initial billing period and thereafter unless terminated by either party giving the other six (6) months' notice in writing.

And in Schedule LP attached to and made a part of the contract it is provided:

> The minimum annual charge shall be $9.00 per maximum kw demand during any one month of the season or $3600. whichever amount is greater.

It further provides:

> In the event that the $3600. minimum is applicable, the balance due to fully pay the $3600, which is owed, shall be paid within 30 days after the end of the current season.

We find this language to be clear and unambiguous. It specifically provides a minimum term of three years and a minimum annual charge during such three-year period of $3,600.

The plaintiff Co-op cited two cases in support of their contention that this is an "availability" contract. These cases are San Joaquin Light & Power Corporation v. Costaloupes, 96 Cal.App. 322, 274 P. 84, and City of Memphis, Tennessee, for and on Behalf of Memphis Light, Gas and Water Division v. Ford Motor Company, 6 Cir., 304 F.2d 845.

An analysis of the cases cited by the plaintiff Co-op establishes, we believe, that they are in point here. In San Joaquin Light & Power Corporation, supra, the opinion describes the contract as follows:

> On May 13, 1921, a written agreement was entered into by and between plaintiff and Costaloupes Company, the terms of which may be summarized. The Costaloupes Company is called the consumer and the San Joaquin Light & Power Corporation is called the company. The company agrees to furnish, and the consumer agrees to take, use, and pay for, electrical energy from the company's system for the term of three years from June 28, 1921, to June 28, 1924, during the continuous period from January 1st to December 31st as it occurs in said period, for the operation of a 15 horse-power motor located on premises de-

scribed as south end quarter of a certain section, provided, however, that the consumer shall guarantee $394 per annum, as per schedule of rates effective; * *.

The consumer's factory buildings and machinery composing the premises served under the contract were destroyed by fire on July 8, 1921, and had not been rebuilt, nor was there any intention to rebuild. Plaintiff corporation brought suit to recover from the defendants money alleged to be due under the contract for the balance of its term. The trial court held for the plaintiff and the district court of appeals affirmed. In connection with the interpretation of the contract, the court stated:

It is obvious that the subject-matter of the contract was the sale and delivery of electrical energy to the consumer, irrespective of its use.

And:

There is nothing in the contract to indicate that the parties contemplated that no amount should become due from consumer in the event that the manufacturing establishment ceased to exist; the contracts with plaintiff plainly imposed an obligation on the consumer to pay the amounts specified whether or not electrical energy was used. We find no merit in this, the appellants' first ground of appeal.

In City of Memphis, Tennessee, for and on Behalf of Memphis Light, Gas and Water Division v. Ford Motor Company, supra, a similar contract was involved. Ford maintained an assembly plant in Memphis, and had a five-year contract with the City of Memphis to provide its requirements for electricity. Ford sold its plant and moved from Memphis before the contract had expired. The City of Memphis sued to recover the minimum charge under the contract for 34½ months, the balance of the contract term. Ford contended that after it sold its plant it no longer required electricity at that location, that such electricity was never generated or used there-

after by Ford, that the interpretation of the contract should not require Ford to pay for electricity that was not generated or that Ford did not use, and that it would be unusual and oppressive if construed to the contrary. The pertinent parts of the contract are set forth in the case report. It provides for a term of five years from the date of initial service, and that the minimum monthly bill shall be computed in accordance with a formula set forth in the contract. The court said:

We are of the view that all of the circumstances of the case, including the fact that the contract specifically provided that it should continue for a term of five years, and that it also provided for payment of minimum monthly bills during that period, sustain the holding of the district court that Ford was liable to the City of Memphis for payment of the minimum monthly bills during that remainder of the five-year period, after which it had sold its plant and discontinued business.

* * * * * *

The interpretation of the contract sought by Ford would result in abrogating the five-year term of the contract and the provision therein for payment of minimum monthly bills whenever Ford decided to purchase no more electric power. The parties are in direct conflict as to the interpretation of the contract and the schedule which is included therein. The five-year term of the contract is plain; and the provision for payment of minimum monthly bills is plain. Taken alone, these clearly sustain the contention of appellee City of Memphis.

We have examined the contract in question in this action and find there is nothing therein to indicate that the parties intended that in the event the payment in one year for electricity used should equal the sum of the three minimum annual charges, or the defendants ceased their operations and had no further use for the electrical energy, there would be no further obligation. The

contract plainly imposes an obligation upon the consumer to pay the amount specified as a minimum for each of the three years stated as the minimum term of the contract, whether electrical energy was used or not.

The trial court rendered its decision interpreting the contract, and pursuant to stipulation theretofore made, evidence was then introduced in support of the defendants' prayer for affirmative relief of reformation. It is the contention of the defendants that paragraph "6. Term" as stated in the contract does not express the actual preliminary agreement of the parties. It is their contention that the parties negotiated prior to entering into the contract, and that during these negotiations they had before them a proposed form of contract which had been drafted by the plaintiff Co-op; that the defendants objected to paragraph "6. Term" as contained in the prepared form because it provided for a three-year minimum period and they did not wish to be bound to a three-year contract. They claim it was agreed paragraph "6. Term" should be changed so as to eliminate the words "and thereafter," and to substitute the word "unless" for the word "until." Thus it is their contention that paragraph "6. Term" should have read as follows:

> This Agreement shall become effective on the date first above written and shall remain in effect until three (3) years following the start of the initial billing period unless terminated by either party giving to the other six months' notice in writing.

The trial court analyzed the allegations of the answer setting forth the affirmative defense and found they do not specify facts constituting fraud, but makes a claim of mistake as the ground for reformation. We agree.

Thus the question arises whether or not the defendants have established an equitable affirmative defense which entitles them to have the contract reformed on the

ground of mistake. There is a sharp conflict in the evidence on this question. The manager of the plaintiff Co-op, who negotiated the contract and was present at all of the conferences and meetings held before and when the contract was negotiated, denies that a preliminary agreement was made to the effect that the contract could be cancelled at any time by the defendants on giving six months' notice in writing. He admitted that the defendants desired to have the word "until" changed to the word "unless" and this was done. There were also some other changes made as agreed.

The defendants, Fisher and Faiman, also testified. They testified that the contract was signed by them at the gravel pit near Sanger, where the power was to be furnished; that it was a cold, windy day, and that they were busy and did not take time to examine the contract carefully, but maintain that they relied on the representations of the manager of the plaintiff Co-op that he had made the changes in the contract which they desired and which had been agreed upon in the preliminary negotiations.

■■■ Our statute provides that written contracts supersede all prior or oral negotiations. Section 9–06–07, N.D.C.C. However, we have held that courts of equity have the power to reform written instruments to conform to the true intention of the parties and that parol evidence is admissible for that purpose. Forester v. Van Auken, 12 N.D. 175, 96 N.W. 301. It is also established that parol evidence of an alleged mutual mistake as a basis for the modification of a written instrument must be clear, satisfactory, specific and convincing, and a court of equity will not grant the high remedy of reformation even upon a mere preponderance of the evidence, but only upon the certainty of error. Ives v. Hanson, N.D., 66 N.W.2d 802; Wilson v. Polsfut, 78 N.D. 204, 49 N.W.2d 102; Metzler v. Bolen, 137 F.Supp. 457; Wheeler v. Boyer Fire Apparatus Co., 63 N.D.

403, 248 N.W. 521. The burden of proof is on the defendants, who allege the mistake, to prove that the written instrument does not fully or truly state the agreement that the parties intended to make. Ives v. Hanson, supra. According to the record, both of the defendants had at least three years' experience in the gravel and sand business. One of the defendants was a high school graduate and had the equivalent of one year of college training. There was no confidential relationship involved, and no evidence of any handicap, physical or mental, that would interfere with reading and understanding the contract. The contract, set forth in the fore part of this opinion, is short and is simple in language on the question of term and minimum charges. The parties admitted that they understood the words "and thereafter" would be construed to make it a contract for a minimum term of three years. One of the partners defendant in this action testified he did not look the contract over thoroughly before signing it, but that no one prevented him from reading it. The other partner testified that he read the contract and that he saw in it the words "and thereafter." He testified relative thereto as follows:

Q. You stated to me that you read the contract when it was returned to you?

A. Yes, I did.

Q. And that then is the contract which is in evidence and marked defendant's Exhibit "A"?

A. Yes, sir.

Q. And you then signed the contract?

A. Yes, I did.

Q. Well, this contract does not have the words "and thereafter," stricken, does it?

A. No, it does not.

Q. Then your testimony is that you read the contract when you signed it, in its present form?

A. Yes, I did.

A little later, the court questioned this defendant and he testified as follows:

THE COURT:

Well now, when this contract was brought out the second time, you said you read it over and you observed then that the words, "and thereafter," had not been stricken out. You said they were stricken in the original memorandum, exhibit "C". You noticed that, did you?

A. You are asking if I noticed the "thereafter" wasn't stricken?

THE COURT:

Was not stricken. It was in the original.

A. Yes.

THE COURT:

And when you read it, you say you observed, in the answer to counsel, that in the final contract those two words were not stricken?

A. That's right. But—

The defendants Fisher and Faiman were partners doing business under the firm name and style of Missouri River Sand and Gravel Company. Each of the partners signed the contract. Both of the defendants now maintain that they relied on the representation of the manager of the plaintiff Co-op that the final draft of the contract had been changed and that there had been eliminated therefrom the words "and thereafter until" and substituted in place of that phrase the word "unless." The then manager of the plaintiff Co-op, who at the time of the trial was no longer employed by the plaintiff, denied that such an agreement was made or that he represented to these defendants that the change had been made in the contract terms.

The trial court found that the defendants Fisher and Faiman had failed to prove by evidence that was clear, certain and convincing that the contract did not express

the true intention of the parties at the time of its execution or that through mistake in the exercise of duty and reasonable diligence for their own interests the defendants were misled, deceived and prejudiced to their substantial rights thereby. The evidence indicates that the plaintiff Co-op expended about $40,000 to build the line to the defendants' gravel pit. It also indicates that the plaintiff may have been interested in crossing the Missouri River with a three-phase high voltage line in hope that it might succeed in selling electrical energy to farmers in the area who operate irrigation pumps. However, under the state of the record, the trial court in its memorandum stated:

> It is not reasonable to believe that the cooperative here would have built a line across the Missouri River and extension five miles and substation with all the facilities required to serve the business of these defendants, without some assurance that the undertaking would not lead to very substantial loss. And the court believes that, that when the defendants became satisfied that the position of the utility was reasonable in that respect that they, notwithstanding perhaps a former intention to sign only a one year contract, allowed, finally allowed and consented to the three year minimum term.

On the record made in this case, and giving appreciable weight to the findings of the trial court before whom the parties testified, we agree with the decision.

 There are other compelling reasons to affirm the trial court. One of the defendant partners testified he read the contract before signing it and acknowledged that he knew the words "and thereafter" had not been eliminated from its provisions. The contract relates to a partnership affair, and our statute provides that notice to any partner of any matter relating to partnership affairs operates as notice to or knowledge of the partnership except in the case of a fraud on the partnership. Section 45–06–04, N.D.C.C. Further, it is well-settled in this state that a party who is without physical or mental handicap and who voluntarily signs a brief, simple and unambiguous contract without reading it, and his only excuse is that he is busy with other matters, and signs the contract hurriedly, is not entitled to produce oral evidence tending to contradict or vary the terms of the contract on the ground that his ignorance of its contents constituted a mistake of fact. Hanes v. Mitchell, 78 N.D. 341, 49 N.W.2d 606. We have also held that a party to a written agreement is bound thereby and it is no defense to show that he neglected to read it before signing, unless he can prove that he was prevented from reading it by fraud, artifice, or design by the other party or his authorized representative. Embden State Bank v. Shea, 50 N.D. 455, 196 N.W. 307; Little v. Little, 2 N.D. 175, 49 N.W. 736.

Under all the circumstances and the evidence in this action we find that the trial court has correctly interpreted the contract and that the defendants have failed to establish clear, satisfactory and convincing evidence as a ground for reformation.

The judgment is affirmed.

STRUTZ, ERICKSTAD and KNUDSON, JJ., concur.

MURRAY, J., not being a member of the Court at the time of submission of this case, did not participate.