MOBIL OIL CORPORATION, a corporation, Plaintiff,

v.

TENNESSEE VALLEY AUTHORITY, Defendant.

Civ. A. No. 71–230.

United States District Court,
N. D. Alabama,
Northwestern Division.

Nov. 18, 1974.

Drayton T. Scott & Drayton Nabers, Jr., Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., Curtis B. Kellar, Gen. Counsel and Philip B. Raue, Associate Gen. Counsel, New York City, for Mobil Oil Corp.

Robert H. Marquis, Gen. Counsel, Herbert S. Sanger, Jr., Deputy Gen. Counsel, Justin M. Schwamm, Asst. Gen. Counsel, Knoxville, Tenn., for Tennessee Valley Authority.

## MEMORANDUM OPINION

LYNNE, District Judge.

The primary question involved in this case is whether Mobil Oil Corporation ("Mobil") is obligated to pay the minimum bill portion of rates for electric service provided to it under contract by Tennessee Valley Authority ("TVA") at Mobil's chemical plant near Mount Pleasant, Tennessee.

Mobil filed this suit on March 19, 1971, seeking to invalidate both an electric rate increase implemented by TVA in October of 1970 and the minimum bill provision of its power contract with TVA. TVA filed a counterclaim for amounts then due and unpaid on the basis of the rates specified in the contract. On November 30, 1971, TVA moved for summary judgment. Mobil thereafter amended its complaint, deleting its allegations concerning TVA's rate increase but retaining its basic contention that the minimum bill provision was invalid for the period through February 28, 1974, the expiration date of the contract. On May 18, 1972, Mobil filed a motion for partial summary judgment, which approximately two weeks later was heard concurrently with TVA's motion for summary judgment. On June 5, 1972, the Court overruled TVA's motion and took Mobil's motion under advisement. On April 3, 1973, TVA filed a second motion for summary judgment on Mobil's amended complaint and on its counter claim, supported by the affidavits of James E. Watson and R. A. Kampmeier, which is now before the Court.

■■ The pleadings, answers to interrogatories, and admissions on file,[1] together with affidavits, show that there is no genuine issue as to any material fact and that TVA is entitled to a judgment as a matter of law. The question before the Court is a legal one—the effect of the minimum bill portion of the rates which, under the contract between the parties, Mobil agreed to pay throughout the contract term. The rates and the contract are before the Court, and are clear and unambiguous. The construction and effect of the contract and the rate provisions included therein are a matter of law to be determined by the Court, and the matter is an appropriate one for determination by summary judgment. Freeman v. Continental Gin Co., 381 F.2d 459 (5th Cir. 1967); Mississippi Power Co. v. Roubicek, 462 F.2d 412 (5th Cir. 1972); Volunteer Elec. Coop. v. Tennessee Valley Authority, 139 F.Supp. 22 (E.D.Tenn. 1954), aff'd on opinion of the district

---

1. Mobil has been permitted to undertake extensive discovery, although in the view the Court now takes of this case, such discovery was unnecessary. TVA has produced thousands of documents in response to motions to produce and has answered interrogatories covering the entire spectrum of TVA's power program. TVA's answers to interrogatories and to requests for admission alone fill over 270 pages. The Court also has before it other materials, such as TVA Annual Reports, of which it can take judicial notice. Illinois Central R. R. v. Tennessee Valley Authority, 445 F.2d 308, 310 n. 4 (6th Cir. 1971).

court, 231 F.2d 446 (6th Cir. 1956); Pipkin v. FMC Corp., 427 F.2d 353 (5th Cir. 1970); Gore v. American Motorists Ins. Co., 441 F.2d 10 (5th Cir.), cert. denied, 404 U.S. 913, 92 S.Ct. 233, 30 L. Ed. 187 (1971).

The material facts are, in summary, as follows:

Prior to 1964 the Virginia-Carolina Chemical Corporation ("V–C") operated facilities at the site of Mobil's present operations and received electric service for such facilities from the City of Mount Pleasant, a distributor of TVA power. A plant expansion by V–C increased its need for electric service to a size which it is TVA's practice to supply directly rather than through a distributor. See Volunteer Elec. Coop. v. Tennessee Valley Authority, *supra*. On June 27, 1963, V–C and TVA entered into a power contract for service to the expanded plant by TVA beginning on March 1, 1964. The contract was in TVA's standard form for industrial customers such as V–C; and provided for a 10-year term and payment of TVA's standard prevailing rates for industrial customers during such term. V–C was merged into Mobil in November 1963, and Mobil succeeded to V–C's rights and obligations under the contract. Thereafter, the contract was amended from time to time at Mobil's request to increase by some 35 percent the amount of power which TVA was obligated to make available under it. The most recent such amendment, effective as of November 30, 1969, fixed the amount of power at 47,100 kW through the remainder of the contract term. Of this amount, 13,100 kW is firm power to be available all of the time, and 34,000 kW is interruptible power to be available at least 98 percent of the time. This is Mobil's "contract demand." [2]

The contract is what is known in the electric power industry as an "availability contract." Section 3 of the contract provides that:

> . . . TVA shall *make available* to Company hereunder a supply of power, sometimes hereinafter referred to as "normal" power and energy, in the respective amounts specified. . . . [3]

Section 7 of the contract provides that "Company shall pay TVA monthly *for power and energy available* under this agreement" during the contract term on the basis of the specified rates.

Section 1 of the Terms and Conditions attached to and made a part of the contract provides that:

> Maintenance by TVA at the point of delivery of voltage within the . . . limits and the frequency contracted for *will constitute availability* of power for purposes of the contract.

TVA has maintained such voltage and frequency, and could at all times have met Mobil's full contract demand.

TVA's standard industrial rates provided in the power contract consist, insofar as pertinent to this case, of a demand charge, an energy charge, a minimum bill charge, and a late payment charge, characterized as a penalty. Rates with these components are in common use throughout the electric industry.

The "demand charge" is an amount charged per kilowatt (kW) based on a "billing demand" which rather commonly (and in the contract in this case) is the customer's highest *actual* demand on the system's capacity during the month. The level of the demand charge per kW is commonly designed to recover most of the power supplier's fixed costs, which

---

2. In the electric power supply industry, contract demand is "the demand that the supplier of electric service agrees to have available for delivery." Federal Power Commission, Glossary of Important Power and Rate Terms, Abbreviations, and Units of Measurement 5 (1965). Contract demand is to be distinguished from actual or measured demand, which is the amount the customer actually chooses to use during any particular month.

3. Emphasis added herein unless otherwise noted.

are essentially the costs related to the investment in capacity.

The "energy charge" is an amount charged per kilowatt hour (kWh) for the customer's actual use of electric energy during the month. It is commonly designed to collect somewhat more than the power supplier's variable costs, which are essentially the costs of producing power through actual plant operation.

The minimum bill charge is:

. . . the lowest amount to which the customer's bill may fall. Unless specifically provided in the rate schedule, this minimum must be paid in each billing period of the customer's contract, whether or not any service is actually taken.[4]

Under TVA's standard industrial rates included in the contract, the minimum bill is in lieu of both the demand and energy charges, and is equal to the firm power demand charge per kW applied to the contract demand.

The "late payment charge" is a fixed percentage of the bill for each specified period that it remains unpaid after it is due. This charge purportedly is designed to ensure that those customers who do not pay their bills on time are responsible for the costs of carrying and collecting their delinquent accounts.

Although TVA is obligated under the contract to make available Mobil's contract demand of 47,100 kW for Mobil's use during the contract term, Mobil is not obligated to use any particular amount of power during any month. Thus, for any particular month Mobil is obligated to pay either the minimum bill or the sum of the applicable demand and energy charges, whichever is higher.

Mobil has used electricity at varying levels throughout the term of the contract. Prior to January 1, 1971, such use was generally at a sufficiently high level so that Mobil was obligated for and paid the sum of the applicable demand and energy charges for most months, but Mobil paid minimum bills on at least eight occasions during this period.[5] In January 1971, Mobil shut down a substantial portion of its Mount Pleasant facilities, having previously notified TVA that it intended to do so and that this would result in its actual use of a comparatively small amount of electricity during the remainder of the contract term. Mobil has continued to use electricity for its other facilities at Mount Pleasant, its largest actual usage for any month being 42,800 kW and 1,206,000 kWh in January 1971. For each month beginning with January 1971, the sum of the demand and energy charges has been less than the minimum bill and the minimum bill therefore became applicable.[6] Mobil has made no payments for any month subsequent to December 1970. It contends here that the minimum bill portion of the standard industrial rates provided for in the contract constitutes a separate disguised liquidated damages clause for breach of contract; that it is invalid as such because it did not represent a reasonable

4. Federal Power Commission, National Electric Rate Book, p. IX (1939).

5. V–C and Mobil also paid minimum bills under the prior contract with Mount Pleasant from August 1962 until the contract with TVA became effective in March 1964, a total of 19 months.

6. As previously noted, under the minimum bill portion of TVA's rates provided for in the contract, there is no additional charge for energy actually used. For example, during December 1970, the last month prior to Mobil's cutback, Mobil used 47,449 kW of power (or 349 kW in excess of the contract demand which TVA was obligated to supply), and 28,091,000 kWh of electric current. The demand charge for the month was $81,626.30 and the energy charge was $99,318.50, or a total of $180,944.80. In December 1971, Mobil used 1,328 kW of power and 656,000 kWh of electricity. Application of the demand and energy charges alone would have amounted to $2,265.00 and $2,328.80, respectively, a total of $4,593.80. Accordingly, the minimum bill provision became applicable, resulting in a billing for the month of $87,135 (i. e., 47,100 x $1.85) in lieu of the separate demand and energy charges. No additional amount was included for the 656,000 kWh of energy which Mobil used.

estimate of damages TVA would suffer if Mobil reduced its actual power use, and because TVA did not sustain actual damages following Mobil's reduction comparable to the amount of the monthly minimum bill; and that the clause should be treated as a penalty and TVA required to prove its actual damages.

Mobil also denies liability for the late payment charge, contending, *inter alia*, that it is an unenforceable penalty, an unconstitutional deterrent to good faith litigation, and arbitrary in light of its stated purpose. It has also failed, for reasons not explained, to make payments under a second contract between the parties (Ex. B to TVA's counterclaim) under which TVA is providing alternate backup power facilities to supply Mobil's plant for which Mobil is obligated to pay a "facilities rental charge" of $75 per month. It is undisputed that TVA has performed its obligations under that contract.

■ This Court is unpersuaded by arguments advanced by counsel for Mobil in penetrating oral arguments and thoroughly excellent briefs. It does not regard the minimum bill portion of the rates as either a liquidated damages clause or a penalty. Rather, it is simply an integral portion of the rates which TVA has fixed, pursuant to the express provisions of the TVA Act, for electric service to industries with contract demands the size of Mobil's on the basis of contracts to pay such rates for an initial term of 10 years.

*First. The TVA power system.* TVA supplies power in an area covering portions of seven states and containing 80,000 square miles and about 6,000,000 people. TVA's customers include three major groups: (1) 160 distributors, consisting primarily of municipal and cooperative systems, which purchase power for resale; (2) 46 industries, such as Mobil, which have large or un-

usual loads and are therefore supplied by TVA directly rather than through distributors; and (3) a number of Federal agencies, of which by far the largest power user is the Atomic Energy Commission for its plants at Oak Ridge, Tennessee, and Paducah, Kentucky.

To supply the needs of these customers, TVA operates the Nation's largest power generating system, including hydroelectric dams, coal-fired and nuclear steam plants, and gas turbine installations. These plants are tied together by 16,400 miles of transmission circuits. In accordance with sections 11 and 15d(h) of the TVA Act,[7] TVA treats its plants as for the benefit of the entire area it supplies, and the electric energy which they generate as part of a common pool. Rates are fixed on a system-wide basis, and are the same for all customers having the same kinds of loads. This is true whether a customer is located near or at a considerable distance from a generating plant, and whether it is an old customer or a new one.

*Second. Purpose of minimum bills applicable for specified periods.* The demand upon a supplier of electric power fluctuates significantly from hour to hour, day to day, and season to season. Electricity is unique in that it cannot be stored to meet the demand for it, but must be available for use instantaneously at the flick of a switch or the push of a button. Accordingly, TVA, like other power suppliers, must provide generating and transmission capacity to meet the total forecasted maximum demands of its customers (including margins in case of outages). This requires very large capital outlays.

The "lead time" required for the construction of new generating facilities had been increasing in recent years, and now ranges from 6 to 10 years.[8] The heavy investment in such facilities must accordingly be committed long before

---

7. 16 U.S.C. §§ 831j and 831n–4(h) (1970).

8. On November 7, 1973, the President, in a public address on the energy crisis, asked the Atomic Energy Commission to examine its procedures with a view to bringing about a reduction in the lead time for nuclear plants from 10 to 6 years. 9 Weekly Compilation of Presidential Documents, p. 1313 (Nov. 12, 1973). See also *id.*, p. 1320.

the facilities are available for use; and the fixed costs associated with such investment (depreciation, interest, maintenance, etc.) continue and must be met whether or not the facilities actually generate electric energy.

Because of this situation, rates chargeable by electric power suppliers to customers with large contract demands, such as Mobil's, commonly provide for minimum bill payments over specified terms of years regardless of the extent to which they actually use the power which the supplier has contracted to make available for them. As stated by the Court of Appeals for the Sixth Circuit in City of Memphis, Tenn. v. Ford Motor Co., 304 F.2d 845 (6th Cir. 1962), when lead times were considerably shorter than they are today:

> [T]he district court found that the custom and practice of electric facilities in the Tennessee Valley area, and throughout the country, is to require large industrial customers, such as Ford, to execute contracts providing for minimum bill requirements, and for terms of five years or more.
>
> . . .
>
> It appears that, in the electric power industry, plans must be made for the determination of power needs from three to five years in advance in order to take care of future loads because of the extended period required for the

planning and construction of large generating units, and this extended period is referred to in the industry as "lead time." It is normally impossible to adjust construction programs to take account of the loss of major loads occurring within such lead time; and this is the economic basis for the industry's requirement of contracts for fixed periods with minimum payment obligations during the entire term of the contract [p. 850].[9]

Here, TVA bases the minimum bill portion of its rates to each industrial customer on the proportion of the fixed costs on its total system generating and transmission capacity allocable to that customer's contract demand. Based on an average system investment of $200 per kW of peak demand for 1971, Mobil's contract demand of 47,100 kW would involve an investment of $9,420,000 and fixed costs of about $1,130,400 per year. Mobil's minimum bill would be $1,045,620 per year.[10] This minimum is payable only during the 10-year term of the contract, and TVA bears the risk with respect to fixed charges for the remaining life of the facilities. Also, as previously noted, there is no energy charge over and above the minimum bill for such energy as Mobil chooses to use while on a minimum bill basis.

*Third. Statutory basis for TVA rate-fixing.* Prior to 1959, the TVA

9. As Mr. Kampmeier's affidavit makes clear, the need for minimum bill protection, and the length of the term for which it is needed, varies directly with the size of the customer's contract demand, and a term of 10 years for a customer with a contract demand the size of Mobil's is fully consonant with industry practice. The same point is made in Caywood, *Electric Utility Rate Economics* (sixth printing, 1972), ch. 3, "The Tariff":

"[Rate] Schedules for larger loads in particular carry term provisions which require that the customer sign a contract for a specified period during which he is committed to certain minimum payments. Such provision is, of course, protection for the utility against idle facilities" (p. 65).

In an earlier discussion of utility pricing (ch. 2, "The Price Structure"), Caywood

lists a number of items influencing rate design, two of which he states as follows:

"17. The larger the load and the lower the price, the more ratchet and term protection the utility needs against loss of load and resulting idle facilities.

\* \* \* \* \*

"20. It is impossible to make prices high enough for short terms for the large load unless the load can be readily replaced" (p. 33).

10. In 1973, TVA adjusted its rates upward to reflect rising costs and revenue needs. The estimated annual fixed costs applicable to Mobil's contract demand were then $1,158,660, and Mobil's annual minimum bill became $1,136,052.

power system was financed almost entirely from appropriations and power revenues.[11] TVA's sales of power and fixing of rates were governed primarily by sections 10, 11, and 14 of the TVA Act.[12] These sections require, among other things, that TVA give preference in the sale of power to states, counties, municipalities, and cooperatives (§ 10); that TVA's projects be regarded primarily "as for the benefit of the people of the section as a whole and particularly the domestic and rural consumers . . . and . . . that sale to . . . industry shall be a secondary purpose, to be utilized principally to secure a sufficiently high load factor and revenue returns which will permit domestic and rural use at the lowest possible rates" (§ 11); and that the "power shall be sold at rates which, in the opinion of the [TVA] Board [of Directors] . . . will produce gross revenues in excess of the cost of production of said power" (§ 14). Section 10 further authorizes the TVA Board to enter into contracts for the sale of power for terms "not exceeding twenty years," and to include in any such contract "such terms and conditions . . . as in its judgment may be necessary or desirable for carrying out the purposes of this Act."[13]

In 1959, section 15d was added to the TVA Act to provide for revenue bond financing.[14] This section requires that TVA repay to the United States Treasury $1 billion of the $1.2 billion of appropriations then invested in the TVA power system at a rate which began at $10 million and is now $20 million per year. It also requires that TVA pay a return to the Treasury each year equal to the Treasury's own current cost of borrowing money applied to the appropriation investment then outstanding. It authorizes the sale of bonds which are backed solely by TVA's power revenues.[15] It further authorizes TVA to pledge its power revenues to the payment of the principal of and interest on such bonds, and to enter into binding covenants with the holders of the bonds with respect to, among other things, "adequacy of charges for supply of power" (§ 15d(a)). It then directs, in subsection (f) that:

> The Corporation *shall* charge rates for power which will produce gross revenues sufficient to provide funds for operation, maintenance, and administration of its power system; payments to States and counties in lieu of taxes; debt service on outstanding bonds, including provision and maintenance of reserve funds and other *funds* established in connection therewith; payments to the Treasury as a return on the appropriation investment pursuant to subsection (e) of this section; payment to the Treasury of the repayment sums specified in subsection (e) of this section; *and such additional margin as the Board may consider desirable* for investment in power system assets, retirement of outstanding bonds in advance of maturity, additional reduction of appropriation investment, and other purposes

---

11. Issuance of some bonds, all guaranteed as to principal and interest by the United States, was authorized under sections 15, 15a, and 15c (16 U.S.C. §§ 831n, 831n–1, 831n–3). By 1959, all bonds issued under any of these sections had been paid off and no authority existed to issue any more such bonds. See Hearings on H.R. 3460 and H.R. 3461 Before the House Committee on Public Works, 86th Cong., 1st Sess. 11 (1959).

12. 16 U.S.C. §§ 831i, 831j, 831m.

13. Under substantive legislative provisions included in the Government Corporations Appropriation Act, 1948 (61 Stat. 577), TVA was required to repay the amount of appropriations made for the power system over a 40-year period without interest.

14. 16 U.S.C. § 831n–4. As enacted, section 15d authorized TVA to have up to $750 million of bonds outstanding (73 Stat. 280). This amount was increased in 1966 to $1,750 million (80 Stat. 346), and in 1970 to $5 billion (84 Stat. 915).

15. Section 15d(b) provides that "Bonds issued by the Corporation hereunder shall not be obligations of, nor shall payment of the principal thereof or interest thereon be guaranteed by, the United States" (16 U.S. C. § 831n–4(b)).

connected with the Corporation's power business, having due regard for the primary objectives of the Act, including the objective that power shall be sold at rates as low as are feasible.[16]

Pursuant to the authority contained in section 15d to covenant with bondholders, TVA, in 1960, adopted a Basic Bond Resolution which by its own terms constitutes a contract by TVA with the holders of its bonds. Sections 3.2, 3.3, and 3.4 of the Resolution contain covenants as to rates and revenues which amplify the requirements set out in section 15d itself.

*Fourth. Nonreviewability of TVA's rates.* Under the TVA Act, it is the duty of the TVA Board to supply all the power needed in its 80,000 square mile area; to do so at "rates as low as are feasible" and which will, in particular, make possible "domestic and rural use at the lowest possible rates"; and at the same time to fix rates which will meet all the requirements of section 15d(f) and the Bond Resolution, including the production of such margin "as the Board may consider desirable," and thereby assure the financial soundness of the system in order that it may continue to be financed through sale of revenue bonds.

■ The fixing of rates which will balance and achieve all of these different objectives is a matter which Congress has entrusted to the judgment of the TVA Board, and which involves the clearest sort of commitment to agency discretion.[17] Where agency action has thus been committed to agency discretion, it is not subject to judicial review. Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958); F.P.C. v. Idaho Power Co., 344

U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15 (1952); Virgin Islands Hotel Ass'n v. Virgin Islands W. & P. Authority, 465 F.2d 1272 (3rd Cir. 1972); Tennessee Elec. Power Co. v. Tennessee Valley Authority, 21 F.Supp. 947 (E.D.Tenn.1938) (Separate conclusion of law No. 33), aff'd, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939); Hahn v. Gottlieb, 430 F.2d 1243 (1st Cir. 1970); Langevin v. Chenango Court, Inc., 447 F.2d 296 (2d Cir. 1971); Alabama Power Co. v. Alabama Elec. Coop., Inc., 394 F.2d 672 (5th Cir.), cert. denied, 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968).

Virgin Islands Hotel Ass'n v. Virgin Islands W. & P. Authority, *supra*, represents the most recent expression of this principle. That case involved a territorial statute relating to the fixing of electric rates in the Virgin Islands which is somewhat similar to section 15d of the TVA Act, but which does not specifically entrust to the judgment of the ratemaking body, as section 15d(f) of the TVA Act does to the TVA Board, the express responsibility for determining the margin over costs which the rates are to produce. T. 30 Virgin Islands Code § 105(a)(12) (Supp.1972), quoted at 465 F.2d 1275, n. 2. The Third Circuit held:

It was undisputed at oral argument that changes in the general rate structure could have been made by the Virgin Islands Legislature, and it is clear that the Authority exercised delegated legislative power when it acted to increase the rates. On the basis of the rationale of Judge Coffin's opinion in Hahn v. Gottlieb, [430 F.2d 1243 (1st Cir. 1970)] *supra*, we rule that the judgment or expertise of the Authority in setting the electric power rates is a matter committed to its discretion

---

16. 16 U.S.C. § 831n–4(f).

17. This point is emphasized in subsection (h) of Section 15d, which provides:

"(h) It is declared to be the intent of this section to aid the Corporation in discharging its responsibility for the advancement of the national defense and the physical, social and economic development of the area in which it conducts its operations by providing it with adequate authority and administrative flexibility to obtain the necessary funds with which to assure an ample supply of electric power for such purposes by issuance of bonds and as otherwise provided herein, and this section shall be construed to effectuate such intent."

by law and is not subject to judicial review [465 F.2d at 1274].[17a]

■■ The language included by Congress in the TVA Act concerning rates and contracts relating to rates—"such additional margin as the Board may consider desirable" (§ 15d(f)), "which, in the opinion of the Board . . . will produce gross revenues in excess of the cost of production" (§ 14), and "such terms and conditions . . . as in [the Board's] judgment may be necessary or desirable" (§ 10)—not only requires the exercise of agency discretion but precludes judicial review. Instead of providing for judicial review, Congress has retained oversight of TVA's rates and its contracts with respect thereto in its own hands. The Comptroller General of the United States is required to audit TVA's accounts annually and to make a report of each such audit to Congress.[18] The TVA Act requires that TVA give Congress and the President "a complete report as to [its] business" for each fiscal year.[19] Each such report must include "the rates at which [power is] sold, and to whom sold, and copies of all contracts for the sale of power."[20] It must also contain "a detailed statement of the operation of the provisions of [section 15d] during the year."[21] In addition, section 4(f) of the Act provides that "any member of

said [TVA] board may be removed from office at any time by a concurrent resolution of the Senate and the House of Representatives." As the Court of Appeals for this Circuit stated in Alabama Power Co. v. Alabama Elec. Coop., Inc., 394 F.2d 672 (5th Cir.), cert. denied, 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968), with reference to the Rural Electrification Act:

> The statute not only fails to provide for judicial review, but when construed in the light of its purpose and of legislative history, the statute retains oversight of the Administrator's actions in the hands of Congress itself and precludes judicial review [394 F. 2d at 675].[22]

See also Schilling v. Rogers, 363 U.S. 666, 674, 80 S.Ct. 1288, 4 L.Ed.2d 1478 (1960); Rural Electrification Adm'n v. Central La. Elec. Co., 354 F.2d 859 (5th Cir.), cert. denied, 385 U.S. 815, 87 S.Ct. 34, 17 L.Ed.2d 54 (1966); Sibley v. Rural Electrification Adm'n, 419 F.2d 384 (5th Cir. 1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1838, 26 L.Ed.2d 269 (1970).

The foregoing conclusions are in no sense new. In Tennessee Elec. Power Co. v. Tennessee Valley Authority, 21 F.Supp. 947 (E.D.Tenn.1938), aff'd, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939), a three-judge court concluded:

---

17a. The quoted principle is apposite since this is *not* one of "those rare cases" wherein there is a genuine issue as to any material fact relative to noncompliance by TVA with its statutory duties in the empirical process of rate making or to constitutional infringement.

18. 16 U.S.C. § 831h(b); 31 U.S.C. §§ 850, 851.

19. 16 U.S.C. § 831h(a).

20. 16 U.S.C. § 831m.

21. 16 U.S.C. § 831n–4(c).

22. Additionally, TVA in marketing electricity is disposing of property of the United States under policies laid down by Congress. Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 336, 56 S.Ct. 466, 80 L.Ed. 688 (1936); Tennessee Elec. Power Co. v. Tennessee Valley Authority, 21 F.Supp. 947, 960–961 (E.D.Tenn.1938), aff'd, 306 U.S.

118, 59 S.Ct. 366, 83 L.Ed. 543 (1939); Tennessee Valley Authority v. Lenoir City, 72 F.Supp. 457, 460–461 (E.D.Tenn.1947). The conditions under which Federal property is to be disposed of is delegated by Article IV of the Constitution to Congress, not the courts. "The power of Congress to dispose of any kind of property belonging to the United States 'is vested in Congress without limitation.' . . . '. . . "And it is not for the courts to say how that trust shall be administered. That is for Congress to determine" ' " (Alabama v. Texas, 347 U.S. 272, 273, 74 S.Ct. 481, 482, 98 L.Ed. 689 (1954)). See also Ashwander v. Tennessee Valley Authority, *supra*, 297 U.S. at 338, 56 S.Ct. 466; United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); United States v. San Francisco, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050 (1940); Federal Power Comm'n v. Idaho Power Co., 344 U.S. 17, 21, 73 S.Ct. 85, 97 L.Ed. 15 (1952).

The Tennessee Valley Authority Act authorizes the Board of Directors of the Authority to fix the rates at which the electric energy generated at the dams authorized by the Tennessee Valley Authority Act may be sold. The statute vests discretion in the board in fixing such rates, and the exercise of this discretion is not subject to judicial review. This provision of the statute is a valid exercise of the power of Congress to dispose of property of the United States.[23]

Since *Tennessee Elec. Power Co.* was decided, the extent and the difficulty of the TVA Board's discretionary responsibilities in fixing rates have been greatly increased as a result of the 1959 revenue bond amendment to the TVA Act. There is thus even greater reason for nonreviewability at the present time.

■ *Fifth. The minimum bill portion of the rates is collectible for the full ten-year contract term.* A minimum bill is in fact a rate for electric service. Avant Gas Serv. Co. v. Corporation Comm'n, 184 Okl. 583, 89 P.2d 291, 292 (1939); Great Northern R. Co. v. Armour & Co., 26 F.Supp. 964, 967 (N.D. Ill.1939). See State v. Sloan, 139 La. 881, 72 So. 428 (1916); Donnell v. Brockman, 117 Ark. 132, 173 S.W. 843 (1915). Minimum bill provisions are an integral portion of TVA's rates and have been from the inception of TVA's power program. This is made clear both by the Watson and Kampmeier affidavits and by various legislative materials which have been called to the Court's attention.[24]

Mobil does not challenge the level of the minimum bill as a rate nor its nonreviewability as a rate. It stated in its May 18, 1972, brief:

We acknowledge that the amount of the charge under the minimum bill provision has been fixed by the TVA Board, and that the TVA Board has discretion in fixing TVA's rates. Mobil, however, makes no attack on the amount charged under the minimum bill provision [p. 40].

Its contention is that the contract should be viewed separately from the rates for which it provides; and that the provision for payment of the minimum bill for the full contract term after Mobil's reduction in actual power use in January 1971 constitutes an invalid liquidated damages clause which should be treated as an unenforceable penalty.

The contract is an agreement under which Mobil simply promises to pay the applicable rates, including minimum bills, for the full contract term. The at-

23. Conclusion of Law 33 of the unpublished Findings and Conclusions. A certified copy of these conclusions is before the Court, and they have been previously relied upon by this Court. See Atchley v. Tennessee Valley Authority, 69 F.Supp. 952, 954 n. 3 (N.D. Ala.1947).

24. TVA's first rates all included minimum bill provisions. 1934 TVA Ann.Rep. 33–36. Its 5-year contract with the Commonwealth and Southern Companies, upheld by the Supreme Court in Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936), contained a provision for minimum payments of $16,200 monthly for the reservation of 20,000 kW of capacity. *Id.* at 24–26. In 1935, when Congress amended sections 10 and 14 of the TVA Act, it had before it testimony that the Commonwealth and Southern Companies were paying minimum bills while not actually taking any power, as well as copies of TVA's then applicable rates, all of which contained minimum bills. Hearings on the Tennessee Valley Authority Before the House Comm. on Military Affairs, 74 Cong., 1st Sess., 30, 160, 287, 469–73 (1935). The industrial contracts and other contracts examined by the Joint Congressional Committee Investigating TVA in 1938 and 1939 all contained minimum bill provisions. S.Doc.No.56, 76 Cong., 1st Sess., App. B (1939). Examination of TVA's annual reports shows not only that TVA continues to include minimum bill provisions in its contracts, but that it reports to Congress the application of such provisions. See, *e. g.*, 1940 TVA Ann.Rep. 91; 1973 *Id.*, vol. II, 52. It is clear and not disputed that inclusion of minimum bill provisions in rates to industries is common in the electric industry. See Federal Power Commission, *National Electric Rate Book*, passim; City of Memphis, Tenn. v. Ford Motor Co., 304 F.2d 845, 850 (6th Cir. 1962); Oliver-Mercer Elec. Coop., Inc. v. Fisher, 146 N.W.2d 346 (N.D.1966).

tempted separation of the minimum bill as a rate from the contract to pay it seems to the Court fallacious. The purpose of the minimum bill is to assure the power supplier of revenue to help meet its fixed costs on capacity made available to supply the customer's contract demand during the term of the contract. A minimum bill which the customer was not obligated to pay throughout the contract term, but only until he might decide to terminate or reduce his actual power use, obviously would not serve this purpose.

Indeed, the nonseparability of power rates and the customer's contract to pay those rates is made clear by the TVA Act itself, as well as by the terms of the contract here involved and by materials showing the general practice in the industry. Section 10 of the TVA Act expressly contemplates that TVA power will be sold under long-term contracts. Section 14, after stating that TVA power shall be sold at rates which in the opinion of the TVA Board will produce gross revenues in excess of the cost of production, goes on to direct that the TVA Board shall include in each annual report "a statement of . . . the rates at which sold, and to whom sold, and copies of all contracts for the sale of power."[25] Section 15d provides, in subsection (f), for the fixing of power rates by the TVA Board after clearly recognizing, in subsection (a), that TVA power is made available under contracts.[26] Mr. Kampmeier's affidavit shows that this is standard practice in the industry, as does also the Federal Power Commission's National Electric Rate Book to which he refers.[27]

For the Court to convert the ten-year term of Mobil's contract to pay the minimum bill portion of the rates into a term of six years and ten months, as Mobil requests, would represent judicial review and modification of TVA's rates just as clearly as would a judicial change in the level of the rates. It would also be incompatible with section 10 of the TVA Act, which expressly authorizes TVA to enter into power contracts "for a term not exceeding twenty years." Mobil's contention would also require the Court itself to fix new rates applicable to Mobil's actual use of power during the remaining three years and two months of the contract term (Complaint, prayer 3), even though TVA has already fixed the applicable rate in the amount of the minimum bill. Such action, apart from the constitutional questions involved,[28] could not be squared with the discretionary responsibilities placed on the TVA Board by the TVA Act in fixing rates or the principle of judicial nonreviewability previously enunciated.[29]

Also of importance in this connection is the fact that TVA has for many years, pursuant to express statutory

---

25. This portion of section 14 was added to the TVA Act by an amendment which became law on August 31, 1935 (49 Stat. 1077). While TVA, as a nonprofit Federal operation, is not subject to the rate jurisdiction of the Federal Power Commission, it is of interest that section 205(c) of the Federal Power Act, which was added on August 26, 1935 (49 Stat. 851), appears to recognize a similar relationship between power rates and contracts in the case of utilities which are subject to FPC's jurisdiction.

26. In the case of directly served industrial customers, TVA's practice is to require a contract for an initial term of five years in the case of customers with contract demands of less than 15,000 kW, and for an initial term of 10 years where, as here, the contract demand exceeds that amount.

27. Each of the 50 sections of the Rate Book (one for each state) contains an identical first page of explanatory material. Under the heading "Contents of Rate Schedule Provisions," there is a discussion of a number of features included in such schedules, the last of which reads:

"*Miscellaneous Provisions.* The term of contract provided in the rate schedules is stated only when a contract extending for a longer period than one year is required. . . ."

28. See Keller v. Potomac Elec. Co., 261 U.S. 428, 441–443, 43 S.Ct. 445, 67 L.Ed. 731 (1923); United States v. Jones, 336 U.S. 641, 652–653, 69 S.Ct. 787, 93 L.Ed. 938 (1949).

29. This is particularly the case in view of Congress' direction that TVA meet the re-

directive, included in its annual reports copies of contracts containing provisions for minimum bills payable over specified contract terms.[30] Congress, though subsequently taking action on numerous occasions to appropriate money for operation of the TVA power system and to amend the TVA Act, has never expressed any disapproval of such contract provisions. To the contrary, Congress has indicated approval of the principle involved on at least two occasions. In 1938, a joint Congressional committee was created by statute to investigate all phases of TVA's activities, including its power rates.[31] The committee employed its own engineering staff to make an analysis of TVA's power program. The engineering report, which was printed as an appendix to the committee's report, discussed among other matters a number of contracts TVA had entered into for sales of power to industries and in so doing stated:

> There may be some reason for criticising [sic] the Tennessee Valley Authority because of the fact that a very high percentage of the power which it has contracted to sell to industries has been made available to the chemical and electrometallurgical groups. . . . While it is not probable, perhaps, it is at least conceivable that both these industries might be affected by adverse business conditions at the same time, in which event a cessation of their operations (or a diminution thereof) would bring about a sudden simultaneous and rather drastic

falling off in the Tennessee Valley Authority's load. . . . However, Tennessee Valley Authority has secured some measure of protection of its revenues against the possibility of such a reduction in sales by reason of the fact that certain minimum bills, lower than the customary monthly minimum when service is being taken by the customer, become operative in such circumstances. These minimum payments vary according to the contract involved, but are of the order of one-third or more of the ordinary minimum. These would be in effect from the time of the curtailment of operations until the date at which the customer could cancel the contract [S. Doc. No. 56, 76th Cong., 1st Sess., App. B, 268 (1939)].[32]

The investigating committee itself, after referring to the "comprehensive analysis" of TVA's power contracts with industries contained in the engineering report, expressly concluded that such contracts "conform with the requirements of the Tennessee Valley Authority Act" (S. Doc. No. 56, 76th Cong., 1st Sess., 164, 168 (1939)).

In 1953, the Atomic Energy Act was amended for the express purpose of authorizing AEC to enter into contracts with TVA and two groups of private utilities which provided for cancellation charges equivalent to payment of minimum bills following reduction or cessation of AEC's actual power use.[33] This amendment was adopted after it was

---

quirements of section 15d(f) and the tests in its Bond Resolution while at the same time keeping rates as low as feasible. For courts to inject themselves into the rate-making and contracting process could create uncertainties that would make the declared statutory policy impossible to carry out.

30. The contract in this case was included in TVA's Annual Report for 1963, at pages A83–86.

31. 52 Stat. 154.

32. As explained in Mr. Kampmeier's affidavit, power contracts entered into by TVA with large industries in the 1930's and

1940's included provisions for minimum bills amounting to about one-third of the bill for full use of the power, whereas minimum bills under the standard industrial rate schedules applicable to Mobil and others in the 1960's and 1970's amount to about half the bill for full use of the power. TVA's financial responsibilities and construction lead times are of course far different today than they were in the 1930's and 1940's.

33. 67 Stat. 182. This amendment was necessary because of R.S. § 3679 (31 U.S.C. § 665), which generally prohibits agencies from undertaking financial obligations in advance of an appropriation therefor. AEC

made clear during congressional committee hearings that such payments by AEC to TVA might continue for four years and three months after cessation of power use, and entail payments to TVA during such period of as much as $130 million.[34]

While the Court is of the firm opinion that the power availability contract in the case *sub judice* is inextricably part and parcel of the rate making function entrusted to the discretion of TVA, and not subject to judicial review, if there were ambiguity in this respect, such long-continued administrative construction by TVA, if clearly concurred in by Congress, would be dispositive.[35] However, the Court disclaims any inclination to attribute clear congressional concurrence to either inattention, indifference, or inaction of that branch of the government overwhelmed by incredibly weighty problems.

Finally, even if the contract were to be viewed independently of the authority fo fix rates, as Mobil suggests, the result would in the Court's view be the same. As previously pointed out, the contract is an "availability contract." *Cf.* City of Memphis, Tenn. v. Ford Motor Co., 304 F.2d 845, 848 (6th Cir. 1962); Oliver-Mercer Elec. Coop., Inc. v. Fisher, 146 N.W.2d 346, 353–355 (N.D.1966); Gatineau Power Co. v. Fraser Companies Ltd. [1941] 2 D.L.R. 487, 496–500, 517 (New Brunswick 1940). Under such a contract, the power supplier agrees to provide a service by making available the customer's contract demand for the contract term. The customer does not agree to use any particular amount of power, but merely to pay a specified sum in exchange for the service—in this case, the minimum bill or the sum of the demand and energy charges, whichever is higher. The na-

---

thus needed either an appropriation for the full cancellation charge or a statutory exemption from the prohibition.

34. See S.Rep.No.477, 83d Cong., 1st Sess. (1953). Hearings on the proposed amendment were held both by the House Appropriations Committee and the Joint Committee on Atomic Energy. The following explanation of the charge was given by Mr. Cook of the AEC:

"Mr. YATES. Let us go back to TVA for a moment. Suppose TVA can shift power over to other Government installations or non-Government users, will there be a diminution in your cancellation cost?

\* \* \* \* \*

"Mr. COOK. The cancellation charge with TVA is based upon their normal load growth, an estimate of how long it would take them to absorb any power that we canceled into their normal load growth of their system. It provides for a continuation of the demand charge during that period, so that they, in turn, can make a return to the Government as they are required by law to amortize their facilities.

"Mr. YATES. Then what you are saying is this. In the event that TVA can shift their power, you will still have to pay the charges to them. It is based upon their estimate—that is, their charges are presently based upon an estimate as to what their loss will be, but *in the event that their loss is not so great, in the event that they are able*

to shift it over to other users, would you nevertheless have to pay those costs to TVA?

"Mr. COOK. *That is right.* But in the event that it takes them longer than the estimate, based upon their normal load growth, we would not pay more" (Hearings on the Second Independent Offices Appropriations for 1954 Before a Subcomm. of the House Comm. on Appropriations, 83d Cong., 1st Sess. pt. 1, 361 (1953).

35. See Brooks v. Dewar, 313 U.S. 354, 61 S. Ct. 979, 85 L.Ed. 1399 (1941); Federal Deposit Ins. Corp. v. Sumner Financial Corp., 451 F.2d 898, 902 (5th Cir. 1971); Swan Lake Hunting Club v. United States, 381 F. 2d 238, 241 n. 3 (5th Cir. 1967); United States ex rel. TVA v. Two Tracts of Land, 456 F.2d 264, 267 (6th Cir.), cert. denied, 409 U.S. 887, 93 S.Ct. 109, 34 L.Ed.2d 143 (1972); City of Tullahoma v. Coffee County, Tenn., 328 F.2d 683, 690–691 (6th Cir. 1964), cert. denied, 379 U.S. 989, 85 S.Ct. 698, 13 L.Ed.2d 609 (1965); Volunteer Elec. Coop. v. Tennessee Valley Authority, 139 F. Supp. 22, 26 (E.D.Tenn.1954), aff'd on opinion of district court, 231 F.2d 446 (6th Cir. 1956); Atchley v. Tennessee Valley Authority, 69 F.Supp. 952, 954 n. 3 (N.D.Ala.1947), Lamb v. Sutton, 164 F.Supp. 928, 933 (M. D.Tenn.1958), aff'd, 274 F.2d 705 (6th Cir.), cert. denied, 363 U.S. 830, 80 S.Ct. 1601, 4 L.Ed.2d 1524 (1960).

ture of such a contract is well described in the *Gatineau* case:

> It seems quite clear to me that under this contract there are mutual obligations. There is an obligation upon the plaintiff to provide the service specified, that is, the maintenance of 20,000 horse-power of electrical energy, of which 13,000 horse-power is to be available at all times and 7,000 horse-power to be available under the conditions set out in ss. 8 and 9, each block of power having the indicated load factor. Provided that is done by the plaintiff then there is an obligation upon the defendant to pay for such electrical energy at the rate specified, namely, at the rate of $20 per horse-power per year, payable monthly. I do not say that the defendant was bound to take the power, even if available; the plaintiff was providing a service, the defendant might use that service or not, but if the service were available the defendant was bound to pay for it [pp. 498–99].

Accordingly, Mobil's reduction in power use in January 1971 was not in itself a breach of contract.[36] Neither has TVA sued for damages for breach of contract because of such reduction; its counterclaim is for the accrued amounts which Mobil is obligated to pay by the terms of the contract.

■ In such a situation, no question of liquidated damages or penalty arises. The applicable principles are clearly stated in 22 Am.Jur.2d Damages, §§ 212–213 (1965):

> The phrase "liquidated damages" means a sum stipulated and agreed upon by the parties, at the time of entering into a contract, as being payable as compensation for injuries in the event of a breach. . . .
>
> \* \* \* \* \* \*
>
> . . . A penalty is an agreement to pay a stipulated sum on breach of

contract, irrespective of the damage sustained. . . .

> A provision for payment of a specified sum as compensation for acts contemplated by the contract, as opposed to compensation for injury resulting from breach of the contract, is neither a penalty nor liquidated damages [pp. 297–299].

This is a general rule of law applicable in contract cases generally. See, *e. g.*, Kirby v. United States, 273 F. 391, 394 (9th Cir. 1921), aff'd, 260 U.S. 423, 427, 43 S.Ct. 144, 67 L.Ed. 329 (1922); Jordan Furniture Co. v. Oklahoma Publishing Co., 171 Okl. 644, 47 P.2d 91, 93–94 (1935); Preyer v. Parker, 257 N. C. 440, 125 S.E.2d 916, 920 (1962); Gunnell v. Nello L. Teer Co., 205 Va. 28, 135 S.E.2d 104, 109 (1964); Folden v. Lobrovich, 171 Cal.App.2d 627, 341 P.2d 368, 369 (1959); Missouri-Edison Elec. Co. v. M. J. Steinberg Hat & F. Co., 94 Mo.App. 543, 68 S.W. 383, 384–385 (1902).

This rule has been applied in numerous instances involving contracts for payment of minimum bills. See Oliver-Mercer Elec. Coop., Inc. v. Fisher, 146 N.W.2d 346 (N.D.1966); San Joaquin Light & Power Corp. v. Costaloupes, 96 Cal.App. 322, 274 P. 84 (1929); Marin Water & Power Co. v. Town of Sausalito, 168 Cal. 587, 143 P. 767 (1914); Beck v. Indianapolis Light & Power Co., 76 N.E. 312 (Ind.App.1905); Gould v. Edison Elec. Illuminating Co., 29 Misc. 241, 60 N.Y.S. 559 (Sup.Ct.1899).

In *San Joaquin*, the customer was held liable for minimum bills for the contract term even though his plant had been destroyed by fire. The court quoted and relied on the following portion of the California Supreme Court's opinion in *Marin*:

> " . . . The contract with which we are here concerned, however, is not the usual agreement to accept and pay for personal property. It is, as we

---

**36.** Mobil itself recognizes this. Its brief of May 18, 1972, states:

"Failure to use the contract demand does not result in a breach" (P. 24).

have shown, one of that class of agreements in which one of the parties promises to pay a minimum sum for a commodity at a fixed rate, such amount to become due whether enough of the commodity to equal such minimum price at the agreed rate is required or not. Such agreements have been upheld and the minimum rate has been sustained as the true measure of recovery, the promise to pay such sum being a part of the direct obligation of the contract and in no sense a covenant for liquidated damages in case of breach" [274 P. at 86, quoting 143 P. at 774].

The court also quoted the following from Curtis on the Law of Electricity:

"A valid contract may be entered into between an electric company and a consumer requiring the payment of a minimum charge. Under such a contract the customer is bound to pay such minimum though he consumes no current at all. The provision requiring the payment of the minimum charge is a part of the direct obligation of the contract and cannot be construed as an agreement for liquidated damages" [274 P. at 87].

Mobil contends that *Beck, Marin,* and *San Joaquin* have been "supplanted" by City of Memphis, Tenn. v. Ford Motor Co., 304 F.2d 845 (6th Cir. 1962). This contention misconceives the holding in that case. There, Ford completely repudiated the contract and ceased taking any power after approximately two years of the five-year term. Memphis elected to treat the repudiation as an an-

ticipatory breach of contract and, unlike the situation here, sued for damages for the breach. Also, reference to the District Court's findings of fact in that case shows that the contract contained a specific clause providing for acceleration of the minimum bills as liquidated damages in the event of a breach.[37] Both the District Court and the Court of Appeals held that in such circumstances, the minimum bills represented the measure of Memphis' recovery and were valid as liquidated damages and not a penalty.

That case, involving as it did damages for breach of a terminated contract, in no way affects TVA's right here to recover the amounts of the minimum bills as they become due because of Mobil's direct obligation under the contract to pay them.[38] Indeed, the District Court in *City of Memphis* cited *San Joaquin* with approval and expressly concluded as a matter of law that:

A contract between an industry and a utility for the purchase of electric energy and for payment of minimum bills throughout a fixed term will be sustained and enforced against the industry even though it does not avail itself of the service. San Joaquin Light & Power Co. v. Costaloupes, 274 P. 84 (Dist.Ct.App., Cal.1929) [Conclusion IV].

This conclusion was apparently fully approved by the Court of Appeals at 304 F.2d 848–849.

In the later case of Oliver-Mercer Elec. Coop. v. Fisher, *supra,* the court cited both *City of Memphis* and *San*

37. A certified copy of the District Court's findings and conclusions has been filed with the Court. See finding No. 1.

38. Mobil has suggested that TVA could have treated its reduction in power use as an anticipatory breach, and that therefore it should be considered as having done so and the minimum bill payments tested as liquidated damages. This suggestion is contrary to Mobil's admission (see footnote 36, *supra*) and the Court's holding that reduction or termination of power use by itself is not a breach of the contract. Even assuming

that TVA could have followed the course suggested, which is at best highly doubtful for other reasons as well (see, e. g., Dingley v. Oler, 117 U.S. 490, 503, 6 S.Ct. 850, 29 L.Ed. 984 (1886); Mobley v. New York Life Ins. Co., 295 U.S. 632, 638–639, 55 S. Ct. 876, 79 L.Ed. 1621 (1935)), it certainly was not obligated to do so but had the option to treat the contract, as it has, as remaining in effect and suing for amounts becoming due under it. Reliance Cooperage Corp. v. Treat, 195 F.2d 977, 982–983 (8th Cir. 1952).

*Joaquin* in holding the customer liable, following a total shutdown of its operations, for payment of minimum bills for the last two years of the three-year contract term as a direct obligation of the contract.

 Finally, Mobil having accepted the benefits of the contract cannot escape its burdens. See United States v. San Francisco, 310 U.S. 16, 29–31, 60 S. Ct. 749, 84 L.Ed. 1050 (1940); Lyle Cashion Co. v. McKendrick, 204 F.2d 609, 612 (5th Cir. 1953).[39]

*Sixth. The late payment penalty.* TVA claims that Mobil's failure to pay the minimum bills as they become due has triggered the provisions of paragraph 2 of the Terms and Conditions of the Mobil contract which exact a late payment penalty of one percent compounded every thirty days on the amount of delinquent bills. The amount of the late payment penalty which has accrued during the course of this litigation exceeds $1,100,000.

TVA claims that this penalty is an integral part of its rates and should be enforced in full without judicial review. Mobil contends that the late payment penalty is not a "rate . . . for power" within the meaning of § 15d(f) of the TVA Act; is an unconstitutional

deterrent to good faith litigation; is an unenforceable penalty, and is arbitrary in light of its stated purpose. Mobil contends further that, as is explained below, the Court's entry of summary judgment for TVA marks a reversal of the law of the case on which Mobil was entitled to rely and that the amount of the penalty which would be inflicted has been greatly increased by unusually protracted proceedings for which Mobil is in no way responsible.

 Assuming *arguendo* that the late payment penalty is an integral part of TVA's rate structure, the Court refuses to enforce it in full in light of the special circumstances of this case.

After filing its answer and counterclaim, TVA filed its first motion for summary judgment on November 30, 1971. Upon completing its first round of discovery, Mobil filed a motion for partial summary judgment in which it contended that as a matter of law the minimum bills were not enforceable in full but that a trial was required to determine the amount of damages, if any, suffered by TVA from Mobil's reduction in power use under the contract. These motions were argued orally on June 2, 1972, at which time the Court stated its view that TVA's motion was due to be

---

39. TVA vigorously insists that even if the minimum bill were regarded as a liquidated damages clause, it would be valid as such and not a penalty. The rule for determining the validity of a contractual attempt to liquidate damages is stated in Southwestern Engineering Co. v. United States, 341 F.2d 998 (8th Cir.), cert. denied, 382 U.S. 819, 86 S. Ct. 45, 15 L.Ed.2d 66 (1965):

First, the amount so fixed must be a reasonable forecast of just compensation for the harm that is caused by the breach, and second, the harm that is caused by the breach must be one that is incapable or very difficult of accurate estimation. . . .

Whether these requirements have been complied with must be viewed as of the time the contract was executed rather than when the contract was breached or at some other subsequent time [341 F.2d at 1001].

Since this Court is of the firm opinion that the minimum bill represents an integral part of TVA's rates, rather than an attempt to liquidate damages, it is obviously unnecessary to consider whether the minimum bill might satisfy either of the foregoing requirements. However, the Court notes in passing that were this issue material to its inquiry on motion for summary judgment, it would have no alternative but to hold that there is a genuine factual dispute as to whether the amount of the minimum bill represents "a reasonable forecast of just compensation for the harm that is caused by the breach." *E. g.,* compare affidavits of W. R. Chaney with affidavits of R. A. Kampmeier and James E. Watson. *See also* "Answers of TVA to Plaintiff's Interrogatories" Nos. 32 & 33 and "Further Answers of TVA to Plaintiff's Interrogatories" Nos. 26 and 27.

overruled and that Mobil was entitled to a trial to determine whether the minimum bill provision was enforceable and the amount, if any, of TVA's actual damages growing from the repudiation. The Court, accordingly, overruled TVA's motion for summary judgment on June 5, and took Mobil's motion for partial summary judgment under advisement. On April 3, 1973, TVA filed a second motion for summary judgment which, in effect, was a motion for reconsideration of the Court's ruling on the first motion. No new ground was asserted in the second motion, and TVA's brief on the motion, though more elaborate than its earlier briefs, asserted no new arguments. The second motion was treated as a special matter on the Court's docket and not scheduled for oral argument until January 31, 1974. Because of the complexity and difficulty of the issues presented, the Court was delayed over nine months thereafter in rendering its judgment.

There can be no doubt that the Court's order overruling TVA's first motion established the law of the case [40] and signalled very clearly that Mobil was entitled to a trial on the merits on its various contentions that the minimum bill provision was penal, unconscionable and arbitrary, or, alternatively, that it set a contract price subject to mitigation. The ruling necessarily meant that, in the Court's view, the provisions of the Mobil power contract were subject to judicial review and would be subjected to a plenary review. Further, the ruling afforded ample ground for Mobil to conclude that the late payment penalty—which is denominated a penalty by TVA in its contract and in each of its bills—would be declared penal and not enforced by the Court.[41]

Upon reconsideration of the case, the Court became convinced that its ruling on the first motion for summary judgment was in error. It therefore has exercised its prerogative to depart from the law of the case established on June 5, 1972. This departure, however, if coupled with the full enforcement of the late payment penalty, would work a grave injustice on Mobil. Mobil is in no way responsible for the Court's reversal or for the protracted period of time it has taken the Court to reach its final decision. If the late payment penalty were enforced in full for the period of June 5 to the present, it would result in a charge to Mobil in exces of $850,000 when during this period Mobil was fully entitled to believe that it would be charged with no late payment penalty. Certainly, Mobil's failure to pay the

---

40. "The denial [of a motion for summary judgment] establishes the law of the case upon the legal point in issue. . . ." 6 J. Moore, Federal Practice ¶ 56.14 [2], at 2258 (1974).

41. Though the Court has not conducted a hearing on whether the late payment penalty is penal and finds it unnecessary to do so, certainly the materials on file lead to the conclusion that it is penal. TVA states that the purpose of the late payment penalty is "to require the customers concerned to be responsible for the costs of carrying and collecting their delinquent accounts." *See* Second Affidavit of James E. Watson at 5. If the late payment charge is designed only to recoup such costs, it is difficult to discern why TVA denominates it a penalty both in the contract it drafted and in each of its bills. TVA's answers to interrogatories and Power Annual Reports, of which the Court takes judicial notice, tend to support the conclusion that in a case such as this the penalty recovers amounts greatly in excess of TVA's costs of carrying and collecting and thereby punishes industrial customers who are delinquent in paying their accounts. For example, during the ten-year period the Mobil contract was effective, the average annual interest rate paid by TVA for short-term money was about $5\frac{1}{2}\%$. *See* "Answers of TVA to Plaintiff's Interrogatories" No. 51. Even as late as the 1972–73 period TVA paid an average annual rate of only $6\%$ on short-term indebtedness. *See* 1973 TVA Power Ann.Rep. at 19. TVA has offered no justification of how the late payment penalty formula reasonably approximates its costs of carrying and collecting accounts.

minimum bills after the law of the case was established on June 5, 1972, is conduct for which it should not be penalized.

■ The decision to depart from the law of the case is one of discretion, and the Court is convinced that departure is justified here. *See* Southern Ry. Co. v. Clift, 260 U.S. 316, 319, 43 S.Ct. 126, 67 L.Ed. 283 (1922). But in so departing the Court will not impose hundreds of thousands of dollars of penalty upon Mobil which accrued in a period protracted by causes beyond Mobil's control and during which Mobil had every right to assume that no late payment penalty would be chargeable. This Court has inherent equitable power to see that its own actions do not work an obvious injustice and exercises that power in light of the special circumstances of this case to limit the enforcement of the late payment penalty. *E. g.*, Reconstruction Finance Corp. v. Prudence Securities Advisory Group, 311 U.S. 579, 582–583, 61 S. Ct. 331, 85 L.Ed. 864 (1941); Ownbey v. Morgan, 256 U.S. 94, 110, 41 S.Ct. 433, 65 L.Ed. 837 (1921); Hanson v. Hoffman, 113 F.2d 780, 791 (10th Cir.

1940); 1B J. Moore, Federal Practice, ¶ 0.404 [3], at 435 (1974).

Accordingly, the Court finds the late payment penalty enforceable only for that period through June 5, 1972, when TVA's first motion for summary judgment was overruled. As the record shows that during this period TVA's costs of carrying and collecting this account were almost certainly less than the one percent compounded monthly exacted by the late payment penalty, and as the delay which has attended the entry of judgment in this case from June 5, 1972, to the present was in no way caused by Mobil, the Court exercises its inherent equity power to charge no further interest on this amount through the date of the judgment. For the minimum bills becoming due since June 5, 1972, the Court has determined that no late payment penalty shall be collected but that simple interest at the statutory rate of six percent per annum shall be added from the date each such bill became due.[42]

An appropriate judgment will be entered in accordance with this opinion.

---

42. TVA has cited several decisions upholding the validity of late payment charges made by various utilities. These decisions do not dictate a result different from that reached by the Court. First, all of these decisions involved charges approved as reasonable by an impartial, independent administrative agency charged by statute with the responsibility of approving such charges. The late payment penalty *sub judice* has been subject to no such review as TVA is a unique corporation whose rates and power contracts are not reviewed by any independent tribunal. Second, none of the cases cited by TVA involved enforcement of a penalty against a party who in good faith had invoked the jurisdiction of a court to have the penalty, as well as other charges, declared unlawful. Though this Court does not find that the late payment penalty is an unconstitutional deterrent to

good faith litigation, as is urged by Mobil, [*e. g.*, Wadley Southern Ry. v. Georgia, 235 U.S. 651, 662–663, 35 S.Ct. 214, 59 L.Ed. 405 (1915); Ex parte Young, 209 U.S. 123, 145–148, 28 S.Ct. 441, 52 L.Ed. 714 (1908)] the Court deems it significant that in none of· the cases cited by TVA was a good faith plaintiff subjected to huge penalties which accrued during the course of the litigation. Finally, and most importantly, none of the cases relied on by TVA involved unusually protracted proceedings which greatly augmented the penalty being inflicted or a departure from the law of the case on which the party being charged with the penalty was clearly entitled to rely. In short, the need for the exercise of a court's equity power to avert a manifestly unconscionable result was simply not a factor in any of the cases on which TVA relies.